783 N.E.2d 360 (2003)
In the Matter of E.L., Appellant-Respondent,
v.
STATE of Indiana, Appellee-Plaintiff.
No. 49A02-0206-JV-449.
Court of Appeals of Indiana.
February 14, 2003.
*361 Jan B. Berg, Indianapolis, IN, Attorney for Appellant.
Steve Carter, Attorney General of Indiana, Christopher C.T. Stephen, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
FRIEDLANDER, Judge.
E.L. was adjudicated a delinquent child after entering into a plea agreement with the State in which she admitted to the allegation of committing an act that would constitute disorderly conduct if committed by an adult. She now appeals presenting the following restated issue: Did the juvenile court abuse its discretion by committing her to the Department of Correction for a one-year recommended term?
We vacate the dispositional decree.[1]
On March 24, 2002, seventeen-year-old E.L. lived with her grandmother, her two half-brothers, and her own one-year-old daughter. E.L.'s mother was visiting that evening, and she and E.L. entered into an argument. The argument, which began with yelling, reached the point where E.L. began throwing picture frames that were hanging on the wall. Betty Tunstall, E.L.'s grandmother and guardian, called the police because she was afraid the argument would escalate.
When officer Jason Hart of the Indianapolis Police Department arrived on the scene, he found E.L. screaming obscenities and crying hysterically. On several occasions, Officer Hart asked E.L. to sit on the *362 couch and stop yelling. According to Officer Hart's account in the probable cause affidavit, "[E.L.] refused to comply with my request and continued to scream, yell, get up and walk around the room making gestures with her hands, and clinching her fists until I placed her in handcuffs and explained to her that she was being arrested[.]" Appendix at 11. Officer Hart arrested both E.L. and her mother.
On March 26, 2002, the State alleged that E.L. was a delinquent child for committing the following acts that would be criminal offenses if committed by an adult: battery, a class A misdemeanor; criminal mischief, a class B misdemeanor; and, disorderly conduct, a class B misdemeanor. Thereafter, on May 8, 2002, E.L. entered into a plea agreement in which she agreed to admit to the disorderly conduct allegation in exchange for dismissal of the two other allegations and an agreement that the State would make no recommendation as to the disposition in the case.
At the disposition hearing on May 14, 2002, E.L. presented evidence regarding her progress at home, in school and in other programs since her successful release from the Department of Correction on October 29, 1999.[2] In particular, Kim Moffett, a social worker for Pike Township Schools, wrote a letter to the court and testified on E.L.'s behalf. Moffett had worked with E.L. since her enrollment at Pike High School in November 1999. Moffett informed the court that E.L. had "tenaciously persisted in her efforts to finish school" and was on track to graduate at the semester's end, in December 2002. Appendix at 30. She further explained that E.L. was also involved in the school-to-work program and maintained a good record in regard to attendance and job performance. With regard to E.L.'s daughter, Moffett noted that E.L. is the child's primary caretaker and "has shown that she is a responsible and attentive mother, very aware of her daughter's needs and what it takes as a parent to meet those needs." Appendix at 30. In her letter to the court, Moffett stated, "I have no doubt that [E.L.] has the capacity to be a very good parent and to accomplish her academic and career goals. She has the desire and the will to provide a good life for herself and her daughter, and with continued support, that is a definite possibility." Appendix at 32. Moffett concluded her letter by advocating on E.L.'s behalf as follows:
Ultimately, [E.L.'s] daughter, [T.], is the person who will suffer or benefit most from the outcome of this hearing. It is a crucial period in her life and the maternal bond is well established, [E.L.] and her daughter would gain the most from a non-punitive intervention such as a structured independent living program. This type of program would allow [E.L.] to finish school, continue with work, and access appropriate supports. I understand that there are many challenges and constraints faced by the juvenile court and appreciate the effort that goes into each decision. In making the determination regarding [E.L.], it is my hope that the court would take the opportunity to substantially impact the life of this young woman and her daughter, [T.] by ordering their participation in an established independent living program.
Appendix at 32.
Angel Knapp-Reese, the program coordinator for the Teen Pregnancy Outreach *363 Service at the Children's Bureau of Indianapolis, also testified on E.L.'s behalf. Knapp-Reese testified that E.L. voluntarily entered the program. Moreover, E.L. regularly kept in contact with Knapp-Reese and "actually was eager" for their meetings. Transcript at 9. Knapp-Reese explained that she worked with E.L. on setting goals for independent living and that E.L. took the initiative to look into different apartment communities on her own. In addition, Knapp-Reese observed that E.L. appears to be very invested in caring for her daughter and hopes to finish high school and provide a home for her daughter. Knapp-Reese concluded her testimony as follows:
I have to admire any young person who is attempting to parent and continue school, because we have so often seen young women opt, to opt out and get their GED's later, and that is a very tough task, to be able to go back, and [E.L.] is trying to maintain and do both at the same time.
Transcript at 10.
Finally, E.L.'s grandmother, Betty Tunstall, testified that E.L. has become very independent and that her attitude has improved over the last couple years. She noted that E.L. is trying to graduate while taking care of her daughter. Although acknowledging that E.L. is not perfect, Tunstall testified that she believed that E.L. was "becoming a much better person, since she became older and realizes that it's time for her to graduate, and to make a step into the real world." Transcript at 16. Finally, Tunstall explained that the recent incident was unusual in light of E.L.'s progress.
Following the presentation of evidence, counsel for E.L., Robert Newell, asked the court to take into account E.L.'s great progress over the last two and one half years and to place E.L. on formal probation with court-ordered counseling. Counsel argued in substantial part:
I don't know if it's the Department of Corrections (sic), or family, or the counselors she's had since that time, or having a baby, or probably just a combination of all of this. But truly something's changed. And uh, she's been out of trouble during that period of time.... Also, I want to point out that she has consistently availed herself um, of whatever assistance was available to her her school, her social worker. She's taken advantage of those things, and she's integrated and incorporated that advice into her life, leaving enough room for the child. Now, obviously (INAUDIBLE) without it's ups and downs, but I think that clearly overall the trend is upward. Clearly the trend is for taking responsibility, and for um, holding herself to a higher standard, which she never did before. She has a child now, she has a chance to be the mother of that child, and to bear responsibility of a household that is free of the kind of trouble that she has experienced.... The period I think, [E.L.'s] in a transitional phase in her life right now. Keeping the home while she's going through all these other things, and availing herself of these other services, and trying to build a life for herself, has been a stressful situation at times, I think that's what probably led to what happened that night. Uh, this unfortunate situation that found [E.L.] conducting herself in a way that I know she regrets.... But the transition I'm sure has been difficult, and I think that speaks somewhat highly of her staying on course throughout the difficulty of trying to be a teenager in her grandmother's home at the same time she's got a child. She's trying to turn herself into a responsible parent. And I think *364 that's what's been going on in her life, and uh, I think we've heard a lot today from the people to indicate that she's taking that role very seriously, and that she will continue to do that if she's given the opportunity. Let me ask the Court to weigh all the factors today.... [S]he did this, she was disorderly, she (INAUDIBLE) some things in the house. I'm sure it was not a pleasant scene. Uh, we can't change that. We can't change the fact that un, that she's been locked up now for a week, and because of that she's been away from her child, and uh, she's taken herself off course, that's for sure. But I ask the Court to consider the entire course of that two and a half years that she's been out of Girls' School, what she's accomplished and has had to accomplish with her life. Whatever help was available she's availed herself of.... I know she's very distraught today. She feels like she's in a position now that it may make all the work she's done meaningless.... I know, that no matter what happens today, given this track record Judge, she'll be fine regardless, but I think the court would be, what I think the court should do today, and this is what we're asking, is that she be put on formal probation, and that the Court order her to continue with whatever counseling she's currently in, and continue on with her involvement with Ms. Knapp-Reese, in the effort to become independent as soon as possible.... I'm sure that with family support and the counseling support, and the other people involved, she'll be able to achieve that. I have no question about that. I'll ask the Court to give her some credit for the two and a half years in which she has made all these efforts, and hold her accountable for what happened here. Let's give her an opportunity to not get to (sic) sidetracked and be away from her baby for a period of time, and let her use this as another growing experience, incorporate this and move forward as she has shown she is able and willing to do. We ask you place her on formal probation with whatever services the Court think (sic) she needs under these circumstances.
Transcript at 20-23.
After these closing remarks, the juvenile court magistrate made the following statement:
I have read the pre-disposition report, as well as the preliminary inquiry. I have also read the pre-dispositional memorandum that was prepared by Ms. Conrad, that gives the Court a great deal of information, which includes a letter from Pike High School, and Ms. Moffitt, and I have listened very intently to the testimony that has been presented through Mr. Newell's ha, witnesses. Um, I guess what I have to say to [E.L.], is that um, that I agree with everything that Mr. Newell has said, and I am very impressed by what this, by what you have done. You certainly displayed to this Court that you are an intelligent young woman, and that you have so much potential. And that your child is in, is very fortunate to have a mother that cares so much. One of this Court's concerns, however [E.L.], is that your mother was likewise very, very young when you were born, and that's a difficult task. And uh, tensions arise in families, and especially when you were young of age and lacking in maturity and experience. One of the most serious things that, that I see in this case is what happened in this home. Now I don't ah, I'm certainly not accusing you of battering your mother. You did not admit to that, and grandmother has, is telling the Court that that didn't happen. However, what happens in a home, and especially during outbursts of anger that *365 result in breaking things, and, and potentially hurting other people because of, of an uncontrollable anger, um, is very, very scary. And it's all the more scary due to the fact that you're a mother and that I don't know where this baby was. Maybe she was present, maybe she was not. But the impact that this kind of an incident has on a tiny child hearing a mother and members of the family, mother and great grandmother, um or at least mother and grandmother screaming at one another, and things breaking, is a terrifying thing. Uh, incomprehensible to a child the age of yours. So, yes it was a family situation, but almost because it was a family situation and that it rose to that level of, of, of, violence, albeit directed towards walls and pictures, and inanimate objects, is, is, very scary, and very very serious. Now you are close to the age of eighteen, and um, and I'm, what I have to do, I've been searching through all of this testimony with (sic) reasons why I could defend such a, such a strong deviation from this Court's policy. And, I weigh everything you've done, and I say to myselfyes, I can, I can support my position in, in following Mr. Newell's recommendations. I can go to my presiding Judge, and I can say "look at what she's done, look at the".. but then I come back to what happened here, and my argument is destroyed, because of what happened, and because of the potential for damaging, perhaps not physically, this baby, but emotionally. It, it it's a cycle of, of kids having kids, and those kids having kids, that has to be broken by your stopping dead in your tracks and saying "yes I'm very young, yes I had this baby prematurely, but I, I will step up to the plate", and you didn't do that. And you didn't have any help from your mother to do it, because she also grew up as a very, very young mother. So, I have to follow this policy [E.L.]. Now you are close to eighteen, and for all intents and purposes, you are not going to remain at the Department of Corrections (sic) for the length of time that I am going to recommend, by virtue of your age, by virtue of your potential, by virtue of what you've accomplished, and by virtue of your attitude, if you maintain that attitude, that you've been carrying with you for the past two years. So, I'm, I'm, I'm obliged, by this Court's policy for the reasons that I've given you, to follow that policy. And I pray, I pray to the good Lord that this will not change your attitude and the course that you set for yourself. Keeping in mind that if you maintain that attitude, I think, that regardless of my recommendation, because of your age and the other things that I've mentioned, and we've talked about today, you can be back in your programs very quickly. So, I must, for the reasons I've explained to you, follow the Court's policy, with a prayer in my heart that this will not change what you've been doing. But that it will be yet a moment to recoil and look back, and figure out what snapped that day, why it snapped, and how it, how you are going to make certain that it never snaps again. So, with that um, being said, the Court does award wardship of [E.L.] to the Department of Corrections (sic), by policy of this Court, given the prior commitment to the Indiana Girls' school. The Court does recommend that [E.L.] remain at the Department of Corrections (sic) for a period of one year; that she be involved in an educational program; pre-professional training; individual counseling, and um there is no claim for restitution.
Transcript at 23-26. Thereafter, Judge Pro Tem Julie Cartmel approved the magistrate's *366 recommendation and awarded wardship of E.L. to the Department of Correction for a recommended period of twelve months. The court further ordered E.L. to complete anger control classes, individual counseling, and a vocational and/or GED program. E.L. appeals this disposition.
The choice of a specific disposition of a juvenile adjudicated a delinquent child is within the sound discretion of the juvenile court, subject to the statutory considerations of the welfare of the child, the community's safety, and the policy of favoring the least harsh disposition. E.H. v. State, 764 N.E.2d 681 (Ind.Ct.App.2002), trans. denied; see also Ind.Code Ann. § 31-37-18-6 (West 1998). A juvenile disposition will not be reversed absent a showing of an abuse of discretion. Such abuse occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. E.H. v. State, 764 N.E.2d 681.
E.L. argues that the unwritten policy adhered to in the Marion County Juvenile Court, in which juvenile offenders who have previously been committed to the Department of Correction are recommitted upon a subsequent offense, is "contrary to the rehabilitative goals of the juvenile justice system, strips the Magistrate of the ability to make an individualized sentencing determination and an independent assessment of the best placement for the juvenile, and impermissibly shifts the focus from what is the least restrictive and most appropriate setting for a juvenile." Appellant's Brief at 6. In sum, E.L. contends that the court abused its discretion because "commitment to the Department of Correction was not warranted on these facts, not in [E.L.'s] best interest, not necessary for the safety of the community, not the least restrictive and most family like setting, and not the least disruptive of family life." Id. at 13.
The statutory scheme for dealing with juveniles is markedly different from the statutory scheme for sentencing adults who commit crimes. E.H. v. State, 764 N.E.2d 681. American society favors individual diagnosis and treatment of juvenile offenders. "It is therefore the policy of this State to ensure that children within the juvenile justice system are treated as persons in need of care, protection, treatment, and rehabilitation." Id. at 685 (internal quotations omitted). In this vein, IC § 31-37-18-6 specifically provides:
If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
(1) is:
(A) in the least restrictive (most family like) and most appropriate setting available; and
(B) close to the parents' home, consistent with the best interest and special needs of the child;
(2) least interferes with family autonomy;
(3) is least disruptive of family life;
(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.
While "a juvenile court has wide latitude and great flexibility in dealing with juveniles, its goal is to rehabilitate rather than to punish." E.H. v. State, 764 N.E.2d at 685. Further, commitment to the Department of Correction should be resorted to only if less severe dispositions *367 are inadequate. See M.R. v. State, 605 N.E.2d 204 (Ind.Ct.App.1992).
In the instant case, the magistrate's comments reveal that she felt constrained, to a certain extent, by the court's policy of recommitment and began with a strong presumption that E.L. should be recommitted to the Department of Correction (the most severe disposition available).[3] While recommitment ultimately may be an appropriate disposition in many instances where a juvenile reoffends after a previous commitment to the Department of Correction, applying a presumption of recommitment in such cases runs the risk of frustrating the rehabilitative goals of the juvenile justice system and necessarily shifts the focus away from less restrictive alternatives. In each case, the mission of the juvenile court must be to make an individualized determination of the most appropriate and least restrictive disposition, considering the best interest of the juvenile as well as the safety of the community. The juvenile court's policy, which effectively creates a presumptive disposition, runs counter to the court's duty to make an individualized determination in each case.
Here, the evidence reveals that despite a rocky start in her early teens E.L. started to turn her life around upon her release from the Department of Correction on October 29, 1999. For over two years, E.L. remained out of the juvenile justice system, actively participating in school, maintaining a positive attitude, and working extensively with service providers to create a better life for herself and her child. The magistrate acknowledged this and specifically stated that she was impressed with E.L.'s progress and described E.L. as an intelligent woman with much potential.
Although agreeing with everything E.L.'s counsel said at the hearing, the magistrate concluded that she was "obliged" to follow the court's policy. Transcript at 25. Following the policy necessarily meant that E.L. would be unable to graduate from Pike High School in December 2002, would be unable to continue working toward independent living with Knapp-Reese, and would be unable to care for and work towards supporting her daughter for a significant period of time. Further, the magistrate's statement reveals that she recognized the risk that recommitment would negatively impact E.L.'s considerable progress.[4]
We conclude that the juvenile court abused its discretion by following its policy of recommitment. Committing E.L. to the Department of Correction for a recommended term of one year conflicted with the rehabilitative goals of the juvenile justice system and was not necessary for the *368 safety of the community and was not in E.L.'s or her daughter's best interests. Less restrictive options, such as probation with court-ordered counseling, existed at the time of the dispositional decree that would have effectively addressed E.L.'s recent misstep, while keeping her on her positive course and with her daughter. Accordingly, we remand with instructions to the juvenile court to vacate its dispositional decree.
Dispositional decree vacated.
NAJAM, J., and SHARPNACK, J., concur.
NOTES
[1] E.L. does not challenge the adjudication of delinquency. The adjudication, therefore, remains unaffected by our disposition of this appeal.
[2] Between January 1997 and March 1999, E.L. had seven complaints filed against her, with several resulting in true findings. The various true findings were for resisting law enforcement, battery, disorderly conduct, and violation of suspended commitment. On April 19, 1999, E.L. was committed to the Department of Correction.
[3] The magistrate expressed that to not order recommitment of E.L. would be "a strong deviation" from court policy, which she would have to defend to her presiding judge. Transcript at 25. Thus, while deviation was possible, the scales were certainly tipped in favor of E.L.'s commitment. The policy had the effect of inappropriately making the issue"Why should E.L. not be committed?" rather than"What is the most appropriate disposition for E.L.?"
[4] As set forth above, the magistrate stated:

So, I'm, I'm, I'm obliged, by this Court's policy for the reasons that I've given you, to follow that policy. And I pray, I pray to the good Lord that this will not change your attitude and the course that you set for yourself. Keeping in mind that if you maintain that attitude, I think, that regardless of my recommendation, because of your age and the other things that I've mentioned, and we've talked about today, you can be back in your programs very quickly. So, I must, for the reasons I've explained to you, follow the Court's policy, with a prayer in my heart that this will not change what you've been doing.
Transcript at 25-26 (emphasis supplied).