v.

**STATE of Indiana, Appellee–Petitioner.**

No. 47A01–0911–JV–557.

Court of Appeals of Indiana.

April 30, 2010.

Transfer Denied July 15, 2010.

Lorinda Meier Youngcourt, Youngcourt Law Office, Huron, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Janine Steck Huffman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Since the age of twelve, J.J. has struggled with mental health problems, substance abuse, and anger management. He has had far too many contacts with the juvenile justice system for someone of such tender years. J.J. has been given every chance to work to solve his problems and comply with the rule of law, but he has continued to reoffend. In just a few short years, J.J. exhausted every rehabilitative program offered by Lawrence County, and is left with no option other than the Department of Correction (DOC). Thus, although tragic, the juvenile court's decision to commit J.J. to the DOC was not an abuse of discretion.

Appellant-respondent J.J. appeals the juvenile court's dispositional order committing him to the DOC following the true findings in four separate causes that J.J. was a delinquent child for acts that would have been Resisting Law Enforcement,[1] a class A misdemeanor, Disorderly Conduct,[2] a class B misdemeanor, Criminal Mischief,[3] a class B misdemeanor, Illegal Consumption of Alcohol,[4] a class C misdemeanor, Public Intoxication,[5] a class B misdemeanor, Possession of Marijuana,[6] a class A misdemeanor, Theft,[7] a class D felony, and Resisting Law Enforcement,[8] a class D felony, had they been committed by an adult. J.J. also admitted to being a Runaway[9] and two instances of Curfew Violations.[10]

J.J. argues that the two findings of delinquency for resisting law enforcement must be reversed because the juvenile referee failed to make sufficient findings in the orders that were ultimately signed by the juvenile court. Additionally, he contends that the juvenile court erred by ordering that he be committed to the DOC.

Finding that one of the delinquency adjudications did not contain sufficient factual findings, and finding no other error, we affirm in part, reverse in part, and remand with instructions.

## FACTS

### J.J.'s History

J.J., who was fifteen years old at the time of the first offenses herein, has a history of offenses beginning at the age of twelve, when he was suspended from school for taking shotgun shells and a knife to school. He also has a history of behavioral issues, violent outbursts, and threats. J.J. has been in foster care twice—first, for a few months at the age of three; second, for two years at the age of twelve. As a child, he witnessed the abuse of his mother at the hands of his father, who was incarcerated several times during J.J.'s childhood.

J.J. has a history of behavior problems, including uncontrolled anger, hitting things, threatening others, and injuring himself. In November 2005, J.J. was evaluated by a psychologist, who concluded that J.J. was suffering from anxiety, depression, and low self-esteem. One month

---

1.  Ind.Code § 35–44–3–3.

2.  Ind.Code § 35–45–1–3.

3.  Ind.Code § 35–43–1–2.

4.  Ind.Code § 7.1–5–7–7

5.  I.C. § 7.1–5–1–3.

6.  Ind.Code § 35–48–4–11.

7.  I.C. § 35–43–4–2.

8.  I.C. § 35–44–3–3.

9.  Ind.Code § 31–37–2–2.

10. I.C. § 31–37–3–2.

later, J.J. was admitted to Meadows Hospital in Bloomington after his foster mother found a suicide note written by J.J. and discovered cuts on his arm. J.J. was released after ten days and was diagnosed with major depression and placed on an antipsychotic medication.

In 2006, J.J.'s foster mother expressed concern about J.J.'s written intention to hurt himself and others. In February 2006, J.J. was adjudicated a delinquent for stealing a golf cart and was placed on probation for one year. In March 2006, J.J. violated probation by failing to obey his foster parents and exhibiting explosive behavior when his foster parents found pornographic material in his backpack.

In October 2006, J.J. was admitted to Meadows Hospital because he had been cutting his arm and hearing voices. He remained in residential treatment until March 2007, and was diagnosed with mood disorder, hallucinations, depression, aggression, psychosis, and borderline intellectual functioning. He was prescribed antipsychotic and antidepressant medications. While J.J. was receiving treatment at the hospital, a psychological evaluation stated that he continued to be angry, defiant, and aggressive. In February 2007, J.J. successfully completed his probation, and in March 2007, he was released to his mother's care.

J.J. received counseling and medication management from the Center for Behavioral Health (CBH) from July 2007 through March 2008. He reported having used marijuana and inhalants to CBH staff during that time. J.J. was diagnosed with intermittent explosive disorder, bipolar disorder, bipolar II disorder with psychotic features, and parent-child relational problem.

### The Instant Offenses

On January 18, 2008, J.J. was combative and disorderly at school. When Bedford Police officers were called to the school, J.J. told the principal and an officer to "f*ck off" and told the officer, "you better not stand close to me, because I will kill you." Tr. p. 96–97. On January 22, 2008, J.J. was admitted to Meadows Hospital, where he stayed for seven days. On January 23, 2008, the State filed a petition in cause number 47C01–0801–JD–38 (JD–38) alleging J.J. to be a delinquent for class A misdemeanor resisting law enforcement, class B misdemeanor disorderly conduct, and class B misdemeanor criminal mischief.

On March 14, 2008, J.J. kicked in the front door of a house. On March 25, 2008, the State filed a petition in cause number 47C01–0803–JD–135 (JD–135) alleging J.J. to be delinquent for class B misdemeanor criminal mischief.

On April 8, 2008, the juvenile court held a factfinding hearing in JD–38 and an initial hearing in JD–135. Following the hearing, J.J. admitted to disorderly conduct in JD–38 and criminal mischief in JD–135. In JD–38, the juvenile court found as true that J.J. resisted law enforcement but did not find that J.J. committed criminal mischief. The juvenile referee made no specific findings of fact in the dispositional order. J.J. was placed on probation.

In September 2008, J.J. was suspended from school and the principal informed the juvenile court that it was not in the best interest of J.J. or the school for J.J. to return to school because his "anger issues pose a danger to himself and the students and staff" at the school." Ex. 1.

On November 8, 2008, J.J. was arrested for public intoxication and illegal consumption. On November 17, 2008, J.J.'s mother reported him as a runaway. Thereafter, on November 26, 2008, the State filed a petition in cause number 47C01–0811–JS–460 (JS–460) alleging J.J. to be a delin-

quent for class C misdemeanor illegal consumption and for being a runaway. The State also filed a motion to modify J.J.'s probation in JD–38 and JD–135.

During his detention hearing in JS–460, J.J. became verbally aggressive. The juvenile court ordered J.J. to be detained at the Southwest Indiana Regional Youth Village. J.J. asked for a police officer to shoot him, said he would not live if the court placed him back at Jackson County Juvenile Detention Center, and threatened to jump out the second story window. On December 8, 2008, J.J. admitted to illegal consumption and being a runaway. On February 4, 2009, the juvenile court placed J.J. on probation in JD–38, JD–135, and JS–460, ordering him to take part in the Juvenile Detention Alternative Program (JDAP).

On May 22, 2009, J.J. was staying at a Budget Inn and refused to return home, stating that if he went home, there would be dead bodies. J.J.'s mother's boyfriend informed a police officer that J.J. was no longer permitted to stay at home because he had threatened to burn down the house. J.J. was placed in a detention center and returned to his mother four days later.

On May 29, 2009, J.J. was arrested for possession of marijuana, public intoxication, and curfew violations. On June 2, 2009, officers were dispatched to a residence at 4:45 a.m. Upon arriving, a woman informed the officers that male subjects had broken into her gate and were in her backyard. When the officers located the intruders, they ran away but were eventually found by the officers. J.J. was one of the subjects who had been running away, and was carrying a backpack containing a large amount of pipe fittings.

On June 22, 2009, the State filed a petition in cause number 47C01–0906–JD–240 (JD–240), alleging J.J. to be delinquent for class D felony receiving stolen property, class A misdemeanor possession of marijuana, class B misdemeanor public intoxication, two curfew violations, two counts of class D felony theft, and class A misdemeanor resisting law enforcement. On June 29, 2009, the State filed a motion to modify J.J.'s probation in JD–38, JD–135, and JS–460.

On August 4, 2009, in JD–240, J.J. admitted to the allegations of both curfew violations, public intoxication, possession of marijuana, and one count of theft. The court found as true that J.J. resisted law enforcement and the remaining allegations were dismissed. The juvenile court did not make specific findings in the order. Following a dispositional hearing, on August 20, 2009, the juvenile court ordered J.J. committed to the DOC for placement at the Indiana Boy's School:

> ... Lawrence County Juvenile Probation has exhausted what means they have for rehabilitation for [J.J.], including but not limited to the Juvenile Detention Alternative Program, Home Detention with Electric Monitoring, Teen Issues classes with therapist ..., juvenile mentoring and home based individual and family therapy through Ireland Home Based Services, Thinking for a Change, Community Works classes, case management assignments specifically to work on issues related to good decision making skills, anger management/aggressive behaviors, inappropriate behaviors at school, and family structure....

Appellant's App. p. 203. J.J. has also participated in inpatient and outpatient services at Meadows Hospital. His mother failed to ensure that he continued with recommended counseling, he failed to take his medication as required, and his probation officer reported that J.J. has not benefited from the panoply of intense services he has received throughout the years. J.J. now appeals.

## DISCUSSION AND DECISION

### I. Lack of Factual Findings

■ First, J.J. directs our attention to the juvenile court's orders in JD–38 and JD–240 declaring him to be delinquent for acts that would have constituted resisting law enforcement had they been committed by an adult. He argues that the delinquency findings cannot stand because there are no findings of fact supporting them.

In both instances, the juvenile referee made no findings of fact whatsoever, merely filling in a blank on an otherwise boilerplate form:

> Comes now the State of Indiana by its deputy/prosecuting attorney.... Comes also the juvenile in person and by counsel ... and with his ... mother for fact finding hearing.
>
> Witnesses sworn, evidence presented and argument heard. The Court, being duly advised, now finds as follows:
>
> *       *       *
>
> That the juvenile did commit the act of *RLE—D felony* [11] and therefore, said child is a delinquent child....

Appellant's App. p. 133 (relating to JD–240) ("RLE—D felony," standing for "resisting law enforcement," was handwritten onto the form), 39 (relating to JD–38). The juvenile referee signed the proposed order. Below the referee's signature is boilerplate language stating, "If made by a Referee, the above FINDINGS and RECOMMENDATIONS are approved and adopted as the FINDINGS and ORDER of the Court on the date file marked hereon." *Id.* at 133. The juvenile court then signed the order below that language.

Indiana Code section 31–31–3–6(2) requires, among other things, that a juvenile court referee "*shall* submit findings and recommendations in writing to the juvenile court, which shall enter such order as it considers proper...." (Emphasis added). Although there is scant caselaw interpreting this statute, this court has had occasion to consider the precise issue before us at least once before. In *R.S. v. State,* a juvenile referee recommended a finding of delinquency to the juvenile court via a boilerplate order that contained no factual findings supporting the ultimate conclusion of delinquency. 435 N.E.2d 1019, 1020 (Ind.Ct.App.1982). This court reversed and remanded, concluding that the order did not

> compl[y] with the spirit of Ind.Code § 31–6–9–2(b) [since repealed and recodified at Indiana Code section 31–31–3–6(2) ]. *Merely finding that the respondent did or did not commit certain acts is not an adequate factual basis upon which the juvenile judge may order a judgment of delinquency ..., or adequate for meaningful review by this court.* We hold that the failure of the referee to make an adequate written record of findings and recommendations pursuant to [the statute] is error, and, therefore, reverse and remand this case with instructions to the referee to make such a written record of her findings.

*Id.* (emphasis added). The *R.S.* court went on to find that the trial court erred in adjudging R.S. to be delinquent where the referee failed to submit adequate findings and recommendations to the court, ordering the trial court to make a decision based

---

11. We note our concern that this delinquency finding was entered as a class D felony. In the delinquency petition, the State alleged that J.J. had committed class A misdemeanor resisting law enforcement, not class D felony resisting law enforcement. And in the facts before us, we fail to see how J.J.'s actions herein rose to the level of a class D felony offense. In any event, upon remand, the referee's findings must address this issue.

upon the new written findings submitted by the referee.

This argument attacks the central finding of delinquency itself rather than the juvenile court's disposition based upon the delinquency finding. Here, the delinquency finding in JD–38 was entered on April 8, 2008. J.J. did not appeal that order or the finding of delinquency, and his attempt to do so at this juncture is untimely. Therefore, we decline to apply this argument to the delinquency finding in JD–38.

As to JD–240, however, the appeal is timely. The language of the statute is plain—the referee *shall* submit findings for the juvenile court's review. I.C. § 31–31–3–6(2). Here, the referee submitted no findings; instead merely offering an abbreviated conclusory statement that J.J. committed class D felony resisting law enforcement. As in *R.S.*, this order does not provide a sufficient factual basis for the juvenile court to make a finding of delinquency or for adequate review by this court.

The State argues that because there was an audio transcript of the factfinding hearing, the referee was not required to make specific findings. There is no such exception in the statute, however, and in any event, the purpose of juvenile referees is to assist juvenile courts with their heavy caseloads by delegating some of the court's responsibilities. *S.W.E. v. State*, 563 N.E.2d 1318, 1323 (Ind.Ct.App.1990). To require the juvenile court to review taped transcripts undermines the purpose of referees, which is to conserve the court's time and resources. The juvenile court should be able to read the recommended order drafted by the referee, glean all relevant facts therefrom, and come to an informed decision about whether or not to adopt the referee's recommendations.

Here, the order did not provide sufficient information for an informed decision.

Therefore, we reverse the juvenile court's finding of delinquency in JD–240 for an act that would have been class D felony resisting law enforcement had it been committed by an adult and remand with instructions to the referee to make a written record of his findings and to the juvenile court to make a decision based upon those findings.

## II. Disposition

■ J.J. next argues that the juvenile court erred by ordering him to be committed to the DOC rather than placed in a less restrictive setting. This court has explained the way in which we review a juvenile court's disposition as follows:

> The choice of a specific disposition for a delinquent child is within the discretion of the trial court, subject to the statutory considerations of the welfare of the child, the safety of the community, and a statutory policy of favoring the least harsh disposition. We may overturn the trial court's disposition order only if we find that it has abused its discretion. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.

*A.M.R. v. State*, 741 N.E.2d 727, 729 (Ind. Ct.App.2000) (internal citations omitted); *see also* Ind.Code § 31–37–18–6 (setting forth statutory considerations to be made in entering a dispositional decree). The role of the juvenile court is to rehabilitate rather than punish. *E.H. v. State*, 764 N.E.2d 681, 685 (Ind.Ct.App.2002).

Here, J.J. directs our attention to a number of issues in arguing that placement with the DOC was an abuse of the juvenile court's discretion: (1) the nature of his prior offenses have all been "minor in nature," appellant's br. p. 10; (2) J.J.

has a history of mental health problems that makes commitment to the DOC improper; and (3) J.J. has a history of substance abuse for which he has not received treatment. J.J. argues that the juvenile court "did not treat [him] as a person in need of care, protection, treatment, and rehabilitation, as the law of Indiana requires." *Id.* at 14.

Although we sympathize with this argument and certainly acknowledge that J.J. is a troubled individual who is grappling with a number of significant problems, we place great weight on the juvenile court's conclusion that "the Lawrence County Juvenile Probation has exhausted what means they have for rehabilitation for [J.J.]...." Appellant's App. p. 203. In just a few short years, J.J. has participated in every juvenile program offered by the county. He has seen countless therapists, taken medication, and taken part in individual, group, and family counseling. None of it has worked. He has continued to reoffend and disrespect the rule of law and his fellow citizens.

J.J., quite simply, has made too many bad choices—whatever the source of those choices may be—and has left the juvenile justice system with no alternative but to order that he be committed to the DOC. Treatments for his mental health problems and substance abuse issues will be available to J.J. through the DOC. Under these circumstances, we cannot say that the juvenile court erred in ordering that J.J. be committed to the DOC for placement with the Indiana Boy's School.[12]

The judgment of the juvenile court is affirmed in part, reversed in part, and remanded with instructions to the referee to make a written record of his delinquency findings in JD–240 and to the juvenile court to make a decision based upon those findings.

DARDEN, J., and CRONE, J., concur.

---

12. In reaching this conclusion, we did not rely on the delinquency finding in JD–240 that we have reversed herein.