## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 13 2018, 11:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| J.T., *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, *Appellee-Petitioner.* | September 13, 2018 <br><br> Court of Appeals Case No. 18A-JV-707 <br><br> Appeal from the Lawrence Circuit Court <br><br> The Honorable Andrea K. McCord, Judge <br><br> The Honorable John M. Plummer, III, Judge <br><br> The Honorable Nathan G. Nikirk, Juvenile Referee <br><br> Trial Court Cause Nos. 47C01-1608-JD-264 47C01-1612-JD-492 47C01-1701-JD-58 47C01-1703-JD-128 |

**Bradford, Judge.**

# Case Summary

[1] In July of 2016, fourteen-year-old J.T. stole a vehicle and was subsequently put on probation. In December of 2016, J.T. stole his mother's car and crashed it into a ravine. J.T. was placed on home detention with electronic monitoring. In January of 2017, J.T. violated the terms of home detention by not reporting to school as required. J.T. was placed in problem-solving court and soon violated its conditions. In March of 2017, J.T. removed his electronic monitor and sneaked out to see his girlfriend. Based on these acts, J.T. was adjudged to be a juvenile delinquent for committing what would be Level 6 felony auto theft, Class A misdemeanor conversion, Class A misdemeanor unauthorized absence from home detention, and Level 6 felony escape if committed by an adult.

[2] In March of 2017, J.T. was placed in the Youth Opportunity Center ("the YOC") for residential treatment, where, over the next several months, he had behavioral issues, including some incidents involving violence. J.T. returned to problem-solving court in August of 2017 and committed many violations over the course of the next several months. At some point, the juvenile court ordered J.T.'s father to pay $30 per month as reimbursement for services rendered to J.T., an amount agreed to by J.T.'s father. Finally, in February of 2018, the problem-solving court moved to terminate J.T.'s participation, and the State requested a commitment to the Department of Correction ("the DOC"). J.T.'s counsel indicated that J.T. also wanted a DOC commitment. The juvenile court ordered DOC commitment and, in April of 2018, ordered

that J.T.'s mother pay $20 per month against the total of $7463 for services rendered to J.T. J.T. contends that the juvenile court abused its discretion in ordering his parents to make monthly reimbursement payments and in ordering him committed to the DOC. Because we disagree, we affirm.

# Facts and Procedural History

[3] J.T. was born on November 4, 2001, and his divorced parents split custody of him. On July 29, 2016, while staying with his father in Bedford, J.T. and two other juveniles stole a vehicle belonging to Joe Pritchett. A witness reported the stolen vehicle being operated erratically, resulting in the police stopping the vehicle. The vehicle was ultimately returned to Pritchett, and it was reported that $363 worth of items were missing from inside the vehicle.

[4] On August 8, 2016, in cause number 47C01-1608-JD-264 ("Cause No. JD-264"), the State filed a delinquency petition alleging that J.T. committed what would be Level 6 felony auto theft if committed by an adult. At a hearing held on October 31, 2016, J.T. entered an admission to the offense and was adjudicated delinquent. J.T. was released to supervised probation pending the dispositional hearing and went back to live with his father.

[5] On December 25, 2016, J.T. was visiting his mother in Bedford. When J.T.'s mother fell asleep, J.T. took her car keys and drove off in her vehicle, which she had not given him permission to take. Shortly thereafter, the authorities received a call from a male indicating that his vehicle was involved in a

"slideout[.]" Tr. Vol. II p. 8. When officers responded to the scene, they encountered J.T. with the stolen vehicle, which he had wrecked by driving into a ravine. J.T. was arrested and detained in the Jackson County Juvenile Detention Center ("the Detention Center").[1] While detained, on December 31, 2016, J.T. had two disciplinary notices because he spoke with other juveniles and scraped paint from the door to his room in violation of the rules. On January 4, 2017, in cause number 47C01-1612-JD-492 ("Cause No. JD-492"), the State filed a second delinquency petition alleging that J.T. committed what would be Level 6 felony auto theft if committed by an adult. After a hearing, J.T. was released to electronic monitoring and home detention at his father's home.

[6] On January 19, 2017, J.T. left home at 7:22 a.m. but did not report to school as was required by his home-detention agreement. J.T. was unaccounted for until 11:16 a.m. That same day, the State filed a request for J.T. to be taken into custody because he was in violation of his home-detention agreement. On January 27, 2017, in cause number 47C01-1701-JD-58 ("Cause No. JD-58"), the State filed a third delinquency petition alleging that J.T. committed what would be Class A misdemeanor unauthorized absence from home detention if committed by an adult.

---

[1] The on-call probation officer in Lawrence County at the time made the decision to transfer J.T. to Jackson County.

[7]　On February 2, 2017, J.T. admitted to the allegations in JD-58 and to an amended allegation of conversion in JD-492. On February 6, 2017, J.T. was placed on supervised probation and ordered into problem-solving court. At that time, J.T.'s parents were informed of their responsibility to pay the fees and costs of problem-solving court and indicated that they desired him to be placed there and understood their financial obligations.

[8]　On February 7, 2017, J.T. violated the conditions of problem-solving court by associating with a negative peer group and violating curfew, and he was sanctioned with community service. On February 14, 2017, J.T. violated the conditions of problem-solving court by associating with a negative peer group, violating curfew, and disrespecting his mother, and was sanctioned by being placed on home detention with electronic monitoring. On February 28, 2017, J.T. violated the conditions of problem-solving court by violating home detention, associating with a negative peer group, and being sent home from school, and he was sanctioned with community service.

[9]　At 12:30 a.m. on March 7, 2017, J.T. removed his electronic monitor, left his mother's home, and went to the hotel where his girlfriend was living with her family. J.T.'s mother contacted the police and reported him missing from home detention. The police located J.T. hiding in the bushes at 1:30 a.m., and he was taken into custody. J.T. was detained again at the Detention Center.

[10]　On March 8, 2017, in cause number 47C01-1703-JD-128 ("Cause No. JD-128"), the State filed a fourth delinquency petition alleging that J.T. committed

what would be Level 6 felony escape if committed by an adult. On March 9, 2017, the probation department filed a petition to modify J.T.'s probation in the other three cause numbers based on the most recent offense. That same day, a hearing was held on the petition In Cause No. JD-128, and J.T. admitted to committing the offense of escape and to the allegations in the petition to modify probation. After an advisement on costs and fees and with his mother's approval, J.T. was placed into the YOC for residential treatment.

[11] J.T. progressed through the phases of the YOC program but continued to have problems. On March 23, March 28, and April 30, 2017, J.T. received incident reports for bad behavior in the YOC. On other occasions, J.T. exited the program without permission, stayed up until 4:00 a.m., failed to follow staff directives, instigated incidents, and struggled to control himself. On July 3, 2017, J.T. was physically aggressive with another resident, threw chairs at tables, emptied a shampoo bottle on another resident's bed, tried to rip another resident's clothing, and ran away into an office and had to be restrained.

[12] J.T. was discharged from the YOC on August 14, 2017, and returned to the problem-solving court, electronic monitoring, and supervised probation. On December 18, 2017, a review hearing was held for the purposes of resolving costs and fees for J.T.'s father. J.T.'s probation officer testified that the following fees were still due in J.T.'s cases:

- Cause No. JD-264: $363 for restitution, jointly and severally with two co-defendants; $181 for court costs;

$4200 for detention costs; and $260 for problem-solving court

- Cause No. JD-492: $181 for court costs
- Cause No. JD-58: $181 for court costs
- Cause No. JD-128: $181 for court costs and $700 for detention costs
- $615 in home-detention fees

The total owed at that point was $6862. J.T.'s father's attorney proposed that J.T.'s father pay an amount between $20 and $30 per month. J.T.'s father indicated that he received $735 a month from SSI and that he was able to pay $30 per month.

[13] J.T.'s second stint in problem-solving court did not go well, and he violated its conditions on several occasions. Below is a list of dates on which J.T. was found to have committed violations, the nature of the violations, and the sanctions imposed:

- September 5, 2017: J.T. violated home detention and missed school assignments and was sanctioned with attending "ZAP."[2]
- September 10 and 11, 2017: J.T. violated curfew and canceled an appointment with therapist Lynn Minton and was sanctioned with community service.
- October 24, 2017: J.T. failed to bring in his journal.

---

[2] "ZAP" refers to the "Zeros Aren't Permitted" program at Bedford North Lawrence High School. *See* BNL SCHOOL IMPROVEMENT PLAN 2016–17, https://www.nlcs.k12.in.us/index.php/programs/school-improvement/school-plans/24-bedford-north-lawrence-high-school/file (last visited August 15, 2018).

- October 31, 2017: J.T. was absent from school on two separate occasions, failed to attend a scheduled appointment with Ireland Home-Based Services ("Ireland"), had poor academics, and failed to complete case plan objectives and was sanctioned with community service.

- December 12, 2017: J.T. failed to attend a scheduled appointment with Ireland, report to community service on two separate occasions, report to drug screens on two separate occasions, participate in tutoring, and provide his complete work schedule and was sanctioned with a suspended commitment to the Detention Center.

- December 19, 2017: J.T. was terminated from his employment and was not honest about the reason for the termination with his probation officer and was sanctioned with community service.

- January 9, 2018: J.T. had poor academics and failed to attend an appointment with Minton and provide a verification of employment and was sanctioned with community service.

- January 30, 2018: J.T. failed to attend work as scheduled and lied about it and was sanctioned with having his 7:00 p.m. curfew revoked.

- February 6, 2018: J.T. associated with negative peers, used an unknown substance that caused impairment, violated curfew, was absent from school, and failed to take prescribed medication and was sanctioned with commitment to the Detention Center.

[14]  On February 8, 2018, the problem-solving court moved to terminate J.T.'s participation in problem-solving court because of his numerous violations, and the State filed a memorandum in support of the court's motion. On February 12, 2018, a petition to modify J.T.'s probation was filed based on his

unsuccessful termination from problem-solving court. At a hearing held that same day, J.T.'s probation officer testified that probation was recommending a DOC commitment because J.T. and his family were refusing to be honest with the probation department and refusing to address their issues. J.T.'s counsel informed the juvenile court that J.T. had requested to be committed to the DOC. J.T. then admitted to violating the terms of his probation by being terminated from problem-solving court. The juvenile court determined—and noted the parties' agreement—that it was in J.T.'s best interests to be committed to the DOC so that he could receive services to rehabilitate. J.T. then requested to be immediately transported to the DOC.

[15] On April 19, 2018, the juvenile court had another review hearing on fees for J.T.'s mother because J.T.'s father had been incarcerated. J.T.'s probation officer testified that the following amounts were still outstanding:

- Cause No. JD-264: $100 for restitution, $181 for court costs, $5100 for detention costs, and $260 for problem-solving court
- Cause No. JD-492: $181 for court costs and $579 in home detention fees
- Cause No. JD-58: $181 for court costs
- Cause No. JD-128: $181 for court costs and $700 for detention costs

The total amount owed was $7463. J.T.'s mother specifically stated that she could pay $20 a month. J.T.'s probation officer indicated that she had spoken with J.T.'s mother and that J.T.'s mother told her that she was "in agreement with starting to get some payments made" and could pay between $20 and $30

per month. Add. Tr. Vol. II p. 6. When asked by the juvenile court if she had any questions about what J.T.'s probation officer had said, J.T.'s mother said, "That's what we agreed—or that's what we talked about outside, so that's fine." Add. Tr. Vol. II. P. 7. The juvenile court ordered J.T.'s mother to pay $20 a month towards the total amount owed.

# Discussion and Decision

## I. Payment for Services[3]

[16] J.T. contends that the juvenile court abused its discretion in ordering his parents to reimburse Lawrence County for various costs and fees incurred in his various delinquency proceedings. Currently, J.T.'s mother is the only one of his parents ordered to make payments, of $20 per month. An order of restitution lies within a trial court's discretion and will be reversed only for abuse of discretion. *Kays v. State*, 963 N.E.2d 507, 509 (Ind. 2012). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court, including any reasonable inferences therefrom. *Priore v. Priore*, 65 N.E.3d 1065, 1072 (Ind. Ct. App. 2016), *trans. denied*. A trial court also abuses its discretion if it misinterprets or misapplies the law. *Baker v. State*, 70 N.E.3d 388, 390 (Ind. Ct. App. 2017), *trans. denied*.

---

[3] The State notes that the juvenile court ordered another fee-review hearing for July 26, 2018, and argues that this issue could very well be moot at this point. Even assuming the hearing occurred as scheduled, it is not part of the record on appeal.

[17] Indiana Code section 31-40-1-3 provides, in part, as follows:

> (a) A parent or guardian of the estate of:
>
> > (1) a child adjudicated a delinquent child[…]
>
> is financially responsible […] for any services provided by or through the department.
>
> [….]
>
> [T]he juvenile court shall order the child's parents or the guardian of the child's estate to pay for, or reimburse the department for the cost of services provided to the child or the parent or guardian unless the court makes a specific finding that the parent or guardian is unable to pay or that justice would not be served by ordering payment from the parent or guardian.

[18] In general, the burden is on the juvenile and/or the parents to present evidence to support the findings that would relieve them of the obligation to reimburse. *See J.W. v. Hendricks Cty. Office of Family & Children*, 697 N.E.2d 480, 483 (Ind. Ct. App. 1998) (affirming an order of reimbursement where "the juvenile court found that the [parents] 'failed to carry their burden of proof to show that they are unable to pay or that justice would not be served by ordering payment from the parents....'"). So, to prevail on his claim, J.T. must establish that the juvenile court abused its discretion in declining to find that his parents were unable to pay or that justice would not be served by ordering them to pay, despite having produced evidence such that no reasonable person could find otherwise. J.T. has failed to carry this burden.

[19] Notably, J.T. never asked the juvenile court to make a finding that his parents could not pay or that justice would not be served by ordering them to. Even if J.T. had asked, there is nothing in the record that would support such findings.

Both of J.T.'s parents had been made aware that additional costs would be incurred when J.T. was placed in problem-solving court and agreed that they would be responsible for them. Before his incarceration, J.T.'s father indicated that he received $735 a month from SSI and that he was able to pay $30 per month. J.T.'s mother indicated in court that she and J.T.'s probation officer had discussed making payments of $20 to $30 per month and agreed that such a payment would be acceptable to her. J.T. has failed to establish that the juvenile court abused its discretion in failing to find that his parents were unable to pay or that justice would not be served by ordering them to pay.

[20] J.T. claims essentially that the juvenile court misapplied the law by failing to make explicit inquiries and findings regarding whether his parents were unable to pay or that justice would not be served by ordering them to pay, drawing our attention to authority for this proposition. This rule, adding requirements not in the statute, first appeared in the case of *Matter of C.K.*, 695 N.E.2d 601 (Ind. Ct. App. 1998), *trans. denied*, in which the parents were ordered to pay $100 per week against a balance of $52,276 for the costs of out-of-home detention following C.K.'s adjudication as a juvenile delinquent. *Id.* at 603. We reversed the juvenile court's order and remanded for further proceedings, concluding that "[s]ound public policy dictates that the court consider [whether the parent or guardian is unable to pay or that justice would not be served by ordering payment] and state its findings thereon before placing such a large financial burden on a delinquent child's parents." *Id.* at 605; *see also In re M.L.K.*, 751 N.E.2d 293, 298 (Ind. Ct. App. 2001) (adopting the *C.K.* approach of requiring

the juvenile court to consider the statutory factors and state its findings before ordering parents to reimburse $21,777.44).

[21] Both *C.K.* and *M.L.K.* are distinguishable on the facts from this case. The extremely large balance of over $52,000 in *C.K.* was one of the bases of its holding, as the court required a hearing and findings, in part, because the order was placing such a "large financial burden" on the parents. Here, the total amount owed is not nearly so large, approximately one seventh the balance in *C.K.* and one third the balance in *M.L.K.* Moreover, the amount of the payments ordered in this case, $20 per month, is less than one twentieth the amount ordered in *C.K.*, at $100 per week, or approximately $400 per month. If J.T.'s parents considered the balance or the monthly payments to be a "large financial burden," they were free to say so, but did not. Both in total amount owed and in terms of immediate financial burden, this case is not comparable to *C.K.* While we decline to declare an amount beyond which explicit findings must be made in cases such as this, we conclude that the balance in this case falls below that threshold.

## II. DOC Commitment

[22] J.T. also contends that the juvenile court abused its discretion in ordering him committed to the DOC. As the State points out, J.T. instructed his attorney to request commitment to the DOC and may not now complain that the juvenile court ordered just that. Under the doctrine of invited error, "a party may not take advantage of an error that she commits, invites, or which is the natural

consequence of her own neglect or misconduct." *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005) (citation omitted). That said, given the gravity of the situation, we choose to address the merits of J.T.'s claim.

[23] A juvenile court is accorded "wide latitude" and "great flexibility" in its dealings with juveniles. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). "[T]he choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion." *Id.* (citing *E.L. v. State*, 783 N.E.2d 360, 366 (Ind. Ct. App. 2003)). The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition. *Id.* (citing *C.C. v. State*, 831 N.E.2d 215, 216–17 (Ind. Ct. App. 2005)). An abuse of discretion occurs when the juvenile court's action is "clearly erroneous" and against the logic and effect of the facts and circumstances before it. *Id.*

[24] The goal of the juvenile process is rehabilitation rather than punishment. *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010). "Accordingly, juvenile courts have a variety of placement options for juveniles with delinquency problems, none of which are considered sentences." *Id.* Indiana Code section 31-37-18-6(1)(A) provides that "[i]f consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that is in the least restrictive (most family like) and most appropriate setting available." "[T]he statute contains language that reveals that a more

restrictive placement might be appropriate under certain circumstances." *J.S.*, 881 N.E.2d at 29 (citing *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied*). The law requires only that the disposition selected be the least restrictive disposition that is "consistent with the safety of the community and the best interest of the child." *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005).

[25] Given the nature of J.T.'s acts of delinquency and the failure of less-restrictive alternatives, we cannot say that the juvenile court abused its discretion in this case. After being given chance after chance to reform himself, even J.T. himself realized that what had been tried was not working. In July of 2016, J.T. began by stealing a vehicle at the age of fourteen and taking hundreds of dollars of items from within. A few months later, J.T. stole his mother's vehicle, eventually wrecking it in a ravine. Less than a month later and while on home detention, J.T. did not report to school as required. Two months after that, J.T. removed his electronic monitor and went to visit his girlfriend. Four delinquency adjudications arose from these incidents—two for what would felonies and two for what would be misdemeanors if committed by an adult.

[26] Once in the juvenile justice system, all attempts to rehabilitate J.T. were consistently resisted and have, to date, ended in failure. While being detained after the second auto theft, J.T. received two disciplinary notices. As mentioned, efforts by J.T. to escape home detention resulted in two additional juvenile adjudications. When J.T. was initially placed in problem-solving court in February of 2017, he was sanctioned for violating its conditions three times

within a month. In March of 2017, J.T. was placed in the YOC, where he continued to have problems. J.T. received three incident reports within two months of placement, and in July of 2017, was involved in an incident where he was physically aggressive, threw furniture, and had to be restrained.

[27] In August of 2017, J.T. was again placed in problem-solving court, and it went no better the second time than it had the first. Over the next several months, J.T. was sanctioned for, *inter alia*, violations of home detention, poor scholastic performance, missed therapy appointments, school absenteeism, missed drug screens, failure to provide work information, lying about the reason for termination from a job, association with negative peers, use of an unknown substance that caused impairment, curfew violation, and failure to take medicine as prescribed. After approximately six months of this, the problem-solving court moved to terminate J.T.'s participation and the probation department recommended commitment to the DOC, a recommendation with which J.T. concurred.

[28] In summary, over the course of approximately one-and-one-half years, J.T. was found delinquent four times and was offered many more less-restrictive options than commitment to the DOC, to no avail. J.T. has consistently failed to take advantage of the leniency shown him, including placement on home detention, problem-solving court, and the YOC and the provision of services such as counseling and therapy. Despite all of these opportunities, the record indicates that J.T. never went more than a few weeks without violating the conditions of these less-restrictive options. Moreover, there do not seem to be many

alternatives left. J.T.'s father is incarcerated, and his mother has indicated that she could not control his behavior and that he has refused to follow her rules. Conventional education has also not been able to help J.T., as he has been suspended from school several times for such acts as fighting, tardiness, failure to put forth sufficient effort, and threatening other students. We believe that it is worth noting that the placement in which J.T. seemed to have the most relative success was also the most restrictive, the residential YOC. Given J.T.'s history and the failure of the measures attempted to date, the juvenile court did not abuse its discretion in ordering a DOC commitment. *See, e.g.*, *J.J. v. State*, 925 N.E.2d 796, 802 (Ind. Ct. App. 2010) (affirmed DOC commitment where "[i]n just a few short years, J.J. has participated in every juvenile program offered by the county[,] seen countless therapists, taken medication, and taken part in individual, group, and family counseling [but] continued to reoffend and disrespect the rule of law and his fellow citizens"), *trans. denied*.

[29] We affirm the judgment of the juvenile court.

Mathias, J., concurs.

Bailey, J., concurs in part and dissents in part with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

J.T.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

Court of Appeals Case No.
18A-JV-707

**Bailey, Judge, concurring in part and dissenting in part.**

[30]  I concur with the majority in affirming the dispositional order committing J.T. to the DOC.  However, I respectfully dissent from the affirmance of the parental financial contribution order.  I, unlike the majority, am convinced that a "large financial burden," slip op. at 13, was imposed on the parents, in that they are subject to a judgment that, at the current rate of payment, would not be satisfied for approximately thirty-five years.  And this financial burden was imposed upon a parental agreement that allows a few dollars per month to be

paid but is wholly absent of findings that address the long-term ability to pay the aggregate obligation.[4]

[31]    The reimbursement statute, Indiana Code Section 31-40-1-3, provides that the juvenile court *shall* order reimbursement *unless* the court makes a specific finding of inability to pay or that justice would not be served by ordering payment. (emphasis added).  The statute further provides that a parental reimbursement obligation shall be paid directly to the department during a juvenile delinquency case; the department shall keep track of all payments; at the end of the action, the department shall provide an accounting of payments received; the court may consider additional evidence and determine parental reimbursement that remains unpaid; and "the court shall reduce the unpaid

---

[4] The juvenile court's order of April 19, 2018 provided in relevant part:

The Court now orders the following amounts be paid and orders that [Parents] are responsible for said amounts:

| 47C01-1608-JD-264: | Court costs - $181.00 |
| | Restitution - $100.00 |
| | Detention costs - $5,100.00 |
| | PSC fee - $260.00 |
| | Additional Detention Fees of $900.00 |
| 47C01-1612-JD-492 | Court costs - $181.00 |
| | Home Detention fees - $579.00 |
| 47C01-1701-JD-58 | Court costs - $181.00 |
| 47C01-1703-JD-128 | Court costs - $181.00 |
| | Detention Costs - $700.00 |

This aggregates to $8,363.00.  At the payment rate of $20.00 per month, 418 payments would be required (over almost 35 years).  The order makes no reference to an ascertainable event that would trigger termination of payments, such as emancipation of J.T. or cessation of juvenile placement services.

balance to a final judgment that may be enforced in any court having jurisdiction over such matters." I.C. § 31-40-1-3(d).

[32] I agree that it is incumbent upon parents to come forward with evidence of their financial circumstances and ultimately, parents bear the burden of showing (1) inability to pay or (2) that justice would not be served by ordering payment. *See J.W. v. Hendricks Cty. Office of Family & Children*, 697 N.E.2d 480, 483 (Ind. Ct. App. 1998). Here, parents have done just that. Mother offered to pay $20.00 monthly from her meager wages. Father was in prison at the last review hearing but previously had an SSI income of $735.00 per month. The willingness and agreement of Mother to contribute does not necessarily render her able to satisfy an $8,363.00 judgment without extreme hardship.

[33] "A juvenile court's order regarding payment of services must abide by [statutory] provisions." *Id.* However, the language of the reimbursement statute neither requires nor prohibits the entry of a judgment in an amount less than the full amount of reimbursement sought. As such, I believe that the juvenile court is not constrained to order parents to pay "all or nothing." Indeed, in *In re Matter of C.K.*, 695 N.E.2d 601, 605 (Ind. Ct. App. 1998), we specifically stated "the court's ability to order reimbursement is not unlimited" and recognized the duty of the trial court to consider whether justice would be served by an order in excess of that which a parent would have paid under child support orders during the child's minority.

[34]     The majority acknowledges that the *C.K.* panel concluded that public policy dictates the court's consideration of parental ability to pay and that the court be required to state its findings before placing "such a large financial burden on a delinquent child's parents." I additionally observe that the *C.K.* Court specified that its order of remand was "for a consideration of both Father's and C.K.'s mother's ability *to pay the entire reimbursement amount sought by the OFC*, and a consideration of whether justice would be served by ordering the parents, or either of them, to pay *the entire reimbursement amount. Id.* (emphasis added.)[5]

[35]     I would, as in *C.K.*, reverse and remand for specific findings regarding the ability of the parents to pay and whether justice would be served by ordering these parents to pay the entire reimbursement amount, an amount undoubtedly far in excess of that for which the parents would have been obligated under the Indiana Child Support Guidelines.[6]

---

[5] C.K.'s father was admittedly liable for a child support arrearage; his admission was not treated as an admission that he could pay the entire amount of reimbursement sought. *C.K.*, 695 N.E.2d at 605.

[6] Although parents are required to complete child support worksheets, the reimbursement statute does not require the juvenile court to refer to the Guideline amounts in fixing reimbursement.