## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 24 2019, 10:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert Austin Rowlett
Angela Sanchez
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| C.M., <br> *Appellant-Respondent,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Petitioner.* | January 24, 2019 <br><br> Court of Appeals Case No. <br> 18A-JV-1631 <br><br> Appeal from the <br> Marion Superior Court <br><br> The Honorable <br> Marilyn A. Moores, Judge <br> The Honorable <br> Gary Chavers, Magistrate <br><br> Trial Court Cause No. <br> 49D09-1801-JD-111 |

**Kirsch, Judge.**

[1] C.M. appeals his placement with the Indiana Department of Correction ("the DOC") following the modification of his disposition after he admitted to dangerous possession of a firearm,[1] which would be a Class A misdemeanor if committed by an adult. C.M. raises the following issue for our review: whether the juvenile court abused its discretion when it ordered his placement in the DOC because he asserts the placement was contrary to the probation department's recommendation and that it was not the least restrictive placement.

[2] We affirm.

## Facts and Procedural History

[3] In the overnight hours of December 1 and 2, 2017, C.M., who was sixteen at the time, was with three friends, two juveniles and one adult, William Martin ("Martin"). *Appellant's App. Vol. II* at 20, 23. At some point, the group decided to "car hop" by breaking into vehicles and stealing things from inside the vehicles. *Id*. at 20-21. The four got into Martin's vehicle and proceeded to drive to a neighborhood in Johnson County. *Id*. at 23. While in the vehicle, the group smoked marijuana. *Id*. at 19-20, 24.

[4] The group then broke into several vehicles and stole some items from the vehicles, including two firearms, a .40 caliber handgun and a 9-millimeter

---

[1] *See* Ind. Code § 35-47-10-5(a).

handgun. *Id.* at 20-21. They eventually came upon a locked truck, inside of which Martin saw an unattended iPhone. *Id.* at 21. Martin wanted to steal the iPhone, so he attempted to break the truck's window with a brick but was not able to do so. *Id.* He returned to the vehicle and retrieved one of the handguns. *Id.* Martin fired two shots into the window of the truck and succeeded in breaking it. *Id.* at 21, 22. Martin grabbed the iPhone, and the group attempted to flee the area. *Id.* at 21.

[5] A resident of the neighborhood, Kerri Edwards ("Edwards") was awake and heard the gunshots. *Id.* at 22. Edwards went to her window and observed the group as they walked down the road but did not recognize any of them as living in the area. *Id.* She called the police, reported the gunfire, and provided the police with a description of some of the group members and of the vehicle. *Id.* Officer Merriman of the Johnson County Sheriff's Office responded to the call, and upon entering the neighborhood, the officer observed a vehicle matching Edwards's description trying to leave the neighborhood. *Id.* at 19. Officer Merriman noticed that the vehicle did not have a license plate light, so he turned on his lights and attempted to initiate a traffic stop of the vehicle. *Id.* The vehicle did not immediately stop, but instead, continued down the road at a slow speed. *Id.* During this time, Officer Merriman observed a lot of furtive movement inside the vehicle. *Id.* Because the group realized that they were about to be pulled over, they quickly placed the handguns and a bag of marijuana inside the glovebox. *Id.* at 20. Officer Merriman called for back-up, and Deputy Ian McLaughlin responded to the call. *Id.* at 22.

[6] Officer Merriman and Deputy McLaughlin initiated a high risk stop based on the furtive movements observed, the vehicle matching the description of a report of shots being fired, and the fact that the vehicle did not immediately stop. *Id*. at 19. When the occupants of the vehicle were removed, Officer Merriman noticed a strong odor of marijuana coming from the passengers and from the vehicle itself. *Id*. at 19-20. When C.M. was arrested, Officer Merriman observed an empty black holster on his person. *Id*. at 20. Officer Merriman searched the vehicle to locate the source of the marijuana smell, and among other items, he found the bag of marijuana, several marijuana joints, miscellaneous tools, a vehicle jack, and two firearms, the loaded 9-millimeter handgun and the unloaded .40 caliber handgun. *Id*. The officers also found a car battery and a speaker box with speakers and an amplifier in the truck. *Id*. Both handguns were later confirmed to have been stolen. *Id*.

[7] Because Martin was an adult, he was transported to the Johnson County Jail. The minors, including C.M., were taken to the Johnson County Sheriff's Office so they could be interviewed with their parents. *Id*. At that time, C.M.'s mother was unable to come to the Sheriff's Office, and C.M.'s father was at work. *Id*. at 21. One of the other minor occupants of the vehicle stated in his interview that C.M. had been holding the unloaded .40 caliber handgun. *Id*. at 20-21. Both of the other minor occupants told the police in separate interviews that the only reason the group was in the neighborhood that night was to "car hop" by breaking into vehicles and stealing their contents. *Id*.

[8] On December 12, 2017, the State charged C.M. with dangerous possession of a firearm, which would be a Class A misdemeanor if committed by an adult. *Id.* at 35-36. While C.M. was detained under this charge, he was cited for two different infraction incidents, one for possession of contraband in the form of corn chips in his room and one for refusing to work on assigned classwork; he received seven hours of lockdown for the two incidents. *Id.* at 67-68. On December 28, 2017, C.M. admitted the allegation that he possessed a firearm, and the case was transferred to Marion County, where C.M. resides, for disposition.

[9] The juvenile court held a detention hearing on January 24, 2018, at which time it "strongly considered commitment to the [DOC] at that time," but decided to place C.M. on formal probation with a suspended commitment to the DOC. *Tr. Vol. II* at 10; *Appellant's App. Vol. II* at 52-53. In the dispositional decree, the juvenile court ordered C.M. released to the custody of his mother, placed him on GPS monitoring, and required him to engage in services with the Cross Systems Care Coordination program and the Project Life program. *Appellant's App. Vol. III* at 26-27. C.M. was also ordered to enroll in an education program and submit to drug screenings. *Id.* On April 9, 2018, C.M. was removed from GPS monitoring. *Appellant's App. Vol. II* at 109.

[10] Within only a few months of being released from detention, the probation department filed a petition for modification of dispositional decrees and alleged that C.M. violated his probation by testing positive for marijuana on April 24, 2018, May 3, 2018, and May 15, 2018. *Appellant's App. Vol. III* at 38. The

petition also alleged that C.M. violated his probation by failing to meet with court-ordered specialists on three separate occasions in May 2018. *Id.* The petition contained allegations that C.M. and his mother also failed to fully engage with the services provided by Cross Systems Care, instead preferring to "handle issues by [themselves]." *Id.* Additionally, it was alleged that C.M. reported that "he does not need help from anybody and he knows and understands everything." *Id.* C.M.'s probation officer recommended that C.M. be again released to his mother on GPS monitoring pending a further hearing. *Id.* at 40.

[11] The juvenile court issued an order for C.M.'s immediate arrest and set the matter for a pretrial hearing on June 11, 2018. *Appellant's App. Vol. II* at 12. At the pretrial hearing, C.M. admitted to the allegations of testing positive for marijuana on three occasions. *Supp. Tr. Vol. II* at 4-6. Counsel for both C.M. and the State indicated to the juvenile court that they had reached an agreement consistent with the probation officer's recommendation. *Id.* at 4. The juvenile court rejected the agreement based on the nature of C.M.'s underlying offense which was "a handgun violation," his prior criminal history, and because he was determined to be a "high risk" to reoffend under the Indiana Youth Assessment Tool. *Id.* The juvenile court set a modification hearing for June 18, 2018, to allow counsel for C.M. time to prepare a Community Release Plan. *Id.* at 7-8.

[12] At the modification hearing, the juvenile court heard arguments from both parties and testimony from several of C.M.'s service providers, his probation

officer, his mother, and himself. *Tr. Vol. II* at 5-10. C.M.'s history indicated that, around age eleven, he began hanging out with other youth in the neighborhood and developed negative behavior such as arguing with his mother and an increased refusal to comply with rules and routines. *Appellant's App. Vol. II* at 93. Between the ages of eleven and thirteen, C.M. began smoking marijuana, and at times, would smoke marijuana daily. *Id*. at 94, 101. At the age of twelve, C.M. expressed a desire to kill himself, and his mother took him to see a psychologist and psychiatrist. *Id*. at 93. C.M. was prescribed medication, which he refused to take; his mother attempted to take C.M. to his appointments with therapists, but he would avoid the appointments and hide from his mother by leaving the house. *Id*. at 93-94.

[13]     Since 2014, C.M. had been arrested and/or adjudicated delinquent for six different charges. *Appellant's App. Vol. III* at 7-8. In 2014, when he was thirteen, C.M. was arrested and charged with leaving home without permission and resisting law enforcement, which would be a Class A misdemeanor if committed by an adult. *Id*. at 8. He was placed on GPS monitoring. *Id*. The same year, C.M. was charged with armed robbery, theft, possession of a controlled substance, criminal recklessness, and carrying a handgun without a license, for which he admitted committing the lesser charge of robbery, which would be a Level 5 felony if committed by an adult. *Id* at 7. He was again placed on GPS monitoring. *Id*. In 2016, at age fourteen, C.M. was found to have committed battery, which would be a Class B misdemeanor if committed by an adult and was placed on probation and required to complete the Cross

Systems Care program, which he did complete. *Id.* In 2017, C.M. was arrested and charged with several offenses, including domestic battery and leaving home without permission of a parent, all of which were found not true except for leaving home without permission of a parent, for which C.M. was given a warning and released. *Id.*

[14] In reference to a psychological evaluation of C.M., his mother stated that he acted secretive and defensive whenever she would ask about his friends or when she would walk into the room when his friends were at their home. *Appellant's App. Vol. II* at 94. C.M.'s mother also stated that she had difficulty disciplining C.M. and that he would frequently argue with her. *Id.* at 90. He struggled to comply with discipline, such as being grounded, and when given such consequences, he would just leave the house. *Id.* C.M.'s mother characterized him as "defiant, disrespectful, argumentative, and openly oppositional towards his parents." *Id.* at 91. C.M. had also often interfered with his mother's parenting decisions with siblings, and instead of allowing her to discipline them, C.M. would do so on his own, including hiding or selling their possessions. *Id.* C.M.'s mother reported finding empty alcohol bottles in C.M.'s bedroom, and he was suspected to have experimented with illicit drugs in 2017 when he took a "pill" that resulted in his vomiting and requiring transportation to a hospital. *Id.* at 101.

[15] At the conclusion of the modification hearing, the juvenile court noted C.M.'s six previous incidents with the juvenile correction system and that "this young man has had so many opportunities." *Tr. Vol. II* at 10. The juvenile court

considered C.M.'s history of criminal conduct, his lack of engagement in Cross Systems Care services and with other service providers, his positive drug screens, and his "high risk" to reoffend per the Indiana Youth Assessment Tool. *Id*. at 10. The juvenile court ordered C.M. to be placed in the DOC for a period of one year, finding that such placement was the "least restrictive alternative consistent with public safety and [the] best interest of the child." *Id*. at 11. C.M. filed a motion for reconsideration, which was denied by the juvenile court. C.M. now appeals.

## Discussion and Decision

[16] C.M. argues that the juvenile court abused its discretion when it ordered him to be placed in the DOC because it was not the least restrictive means to accomplish his rehabilitation. He contends that the plan proposed by the probation department, consisting of GPS monitoring with strict adherence to the Community Release Plan, was less restrictive than placement in the DOC and most consistent with Indiana Code section 31-37-18-6. C.M. further asserts that the juvenile court did not make a specific finding that "community safety required sending [him] to [the] DOC" and that the record showed that "for the most part, [he] responded well to interventions far short of DOC commitment." *Appellant's Br*. at 18, 19. He maintains that there was a range of placements available to the juvenile court that would have been less harsh than commitment to the DOC and that his placement in the DOC was contrary to the logic and effect of the facts before the juvenile court.

[17]    "A juvenile court is accorded 'wide latitude' and 'great flexibility' in its dealings with juveniles." *J.T. v. State*, 111 N.E.3d 1019, 1026 (Ind. Ct. App. 2018) (citing *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008)). The choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be reversed if there has been an abuse of that discretion. *Id.* "The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition." *Id.* An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

[18]    The goal of the juvenile process is rehabilitation rather than punishment. *Id.* "'Accordingly, juvenile courts have a variety of placement choices for juveniles who have delinquency problems, none of which are considered sentences.'" *Id.* (quoting *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010)). Indiana Code section 31-37-18-6(1)(A) provides that "[i]f consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that is in the least restrictive (most family like) and most appropriate setting available." "[T]he statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement." *J.S.*, 881 N.E.2d at 29 (citing *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied*). The law requires only that the disposition selected be the least restrictive disposition that is "consistent with the safety of

the community and the best interest of the child." *J.T.*, 111 N.E.3d at 1026 (citing *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005)).

[19] At the time of disposition in this case, C.M. was seventeen years old and had been involved in the juvenile justice system since he was thirteen years old. His delinquency history included true findings for robbery, which would have been a Level 5 felony if committed by an adult; battery, which would have been a Class B misdemeanor if committed by an adult; and dangerous possession of a firearm, which would have been a Class A misdemeanor if committed by an adult. *Appellant's App. Vol. III* at 7-8. Over the course of the four years since C.M. entered the juvenile court system at thirteen years old, several other allegations were rejected, dismissed, or not filed, including allegations of resisting law enforcement, leaving home without permission of a parent, armed robbery, theft, possession of a controlled substance, criminal recklessness, carrying a handgun without a license, and domestic battery. *Id*. C.M. had been on probation three times and GPS monitoring twice in the last four years. *Id*. In the few weeks between his initial hearing and detention hearing, C.M. was involved in two incidents in the juvenile detention center, in which he failed to follow the rules and policies. *Appellant's App. Vol. II* at 67-68. He admitted to testing positive for marijuana three times within months of being released from detention on the instant allegation, and the record showed that he had been consuming marijuana since he was thirteen years old and at times did so daily. *Appellant's App. Vol. III* at 94, 101; *Supp. Tr. Vol. II* at 4-6. The record also demonstrated that C.M. resisted his mother's discipline and would interfere

with her disciplining of his siblings, which caused his mother increased stress and health problems and marital discord between his parents. *Appellant's App. Vol. II* at 90-91. Additionally, although he had responded well to GPS monitoring in the past, C.M. reverted to his past bad behavior when he was released from the monitoring, which was evidenced by the fact that he was released from GPS monitoring on April 9, 2018 and tested positive for marijuana three times within only a few weeks. *Id*. at 109; *Appellant's App. Vol. III* at 38.

[20] C.M. asserts that the GPS monitoring proposed by the probation department was the least restrictive disposition or that other least restrictive alternatives other than the DOC placement existed. Just because a less restrictive alternative exists, however, does not mean that the juvenile court must follow it. *D.C. v. State*, 935 N.E.2d 290, 292 (Ind. Ct. App. 2010) ("[T]he availability of a less restrictive alternative does not mean the juvenile court was required to order that placement."), *trans. granted on other grounds*. Indiana Code section 31-37-18-6 provides that the trial court is only required to consider the least restrictive placement *if* that placement comports with the safety needs of the community and the child's best interests. *See J.B. v. State*, 849 N.E.2d 714, 717-18 (Ind. Ct. App. 2006) (concluding that the trial court did not abuse its discretion when it committed the juvenile to the DOC because the less-restrictive placement suggested by him would have fallen short of meeting the community's safety needs), *trans. denied*.

[21] Here, the juvenile court specifically stated that placement in a juvenile correctional facility through the DOC was warranted because previous services, such as Cross System Care, had been tried numerous times and that C.M. had failed to engage well in the services. *Tr. Vol. II* at 10. The juvenile court also noted the fact that C.M.'s underlying offense involved a handgun and that this offense was his second gun-related offense, which demonstrated his willingness to violate the rights of others. *Id.* The juvenile court further considered C.M.'s lengthy history with the juvenile justice system and took notice of the many opportunities C.M. had been offered to change his behavior. *Id.* It also took into consideration that C.M. was shown to be at a high risk to reoffend by the Indiana Youth Assessment Tool. *Id.*

[22] In mentioning the seriousness of C.M.'s underlying offense and past offense and his high risk to reoffend, the juvenile court considered his danger to the safety of the community. We have previously found that the seriousness of an offense and the likelihood of re-offense allow for commitment to the DOC. *See, e.g.*, *D.C.*, 935 N.E.2d at 293 ("Given the serious nature of D.C.'s offense and the likelihood that he will reoffend, this is clearly a situation in which commitment to a less restrictive environment than DOC is not in the best interest of D.C. or of the community."). Further, the juvenile court's finding that C.M. had been offered many community-based services in the past, which had failed to curb his delinquent behavior, showed that such services were no longer in C.M.'s best interest.

[23] We, therefore, conclude that it was reasonable for the juvenile court to find that the many services and opportunities offered to C.M. had not been successful and that he posed a danger to both himself and to the community. Because of the serious nature of C.M.'s underlying offense, the volume of his criminal history, his failure to engage in and benefit from past services offered, and the likelihood that he will reoffend, we find that the juvenile court was within its discretion to conclude that commitment to a less restrictive environment than the DOC was not in the best interest of C.M. or consistent with the safety of the community. The juvenile court did not abuse its discretion when it ordered C.M.'s placement in the DOC.

[24] Affirmed.

Riley, J., and Robb, J., concur.