## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 25 2019, 6:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

E.M.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

April 25, 2019

Court of Appeals Case No.
18A-JV-706

Appeal from the Lawrence Circuit Court

The Honorable Andrea K. McCord, Judge

Trial Court Cause Nos.
47C01-1607-JS-227, 47C01-1509-JD-362

**Altice, Judge.**

**Case Summary**

[1] E.M. appeals the trial court's order imposing costs and ordering his parents to reimburse expenses totaling $7997. E.M. argues that the trial court abused its discretion in levying costs without a hearing and without consideration of statutory factors, including his parents' ability to pay and whether reimbursement served the interest of justice.

[2] We reverse and remand.

## Facts & Procedural History

[3] E.M. was born on January 13, 2001, and his now-divorced parents share responsibility for him. On July 14, 2015, E.M., then fourteen years old, intentionally damaged the property of another without that person's consent. On September 8, 2015, E.M. left school without his father's permission, knowing that his father wanted him to be there. On September 17, 2015, E.M. knowingly exerted unauthorized control over the property of the Thornton Teen Center with intent to deprive the center of the use or value of the property. Based on these incidents, on September 28, 2015, in Cause No. 47C01-1509-JD-362 (JD-362), the State filed a delinquency petition alleging that E.M. committed Class B misdemeanor criminal mischief if committed by an adult, the status offense of runaway, and Class A misdemeanor theft if committed by an adult. Due to E.M.'s behavior pending the dispositional hearing, E.M.'s family decided to place E.M. in the Columbus Behavioral Treatment Center on November 3, 2015, where he remained until February 26, 2016. At a hearing on April 25, 2016, E.M. admitted to the criminal mischief and runaway

allegations, and the theft allegation was dismissed. E.M. was adjudicated a delinquent and placed on supervised probation.

[4] On July 5, 2016, E.M. left home without his father's permission and did not return after his father asked him to. As a result of this incident, the State filed a second delinquency petition under Cause No. 47C01-1607-JS-227 (JS-227) for the status offense of runaway. E.M. was placed on electronic monitoring pending disposition of the case. On July 14, 2016, E.M. travelled to a location not authorized in writing by the home detention supervising agency. For this incident, the State filed a third delinquency petition under Cause No. 48C01-1607-JD-233 (JD-233), alleging that E.M. committed the offense of unauthorized absence from home detention, a Class A misdemeanor if committed by an adult. The State also filed a petition to modify E.M.'s probation in JD-362 based on the filing of the delinquency petitions in JS-227 and JD-233.

[5] On July 25, 2016, the juvenile court held a hearing with regard to all outstanding matters. During this hearing, E.M.'s father requested that a public defender be appointed to represent E.M., which the trial court granted. The court found E.M. to be a flight risk and therefore ordered that he be detained at the Jackson County Juvenile Detention Center (JCJDC). E.M. remained at the JCJDC until August 3, 2016, at which time he was transferred to the Logansport Juvenile Correctional Facility for a comprehensive evaluation.

E.M. was evaluated from August 3 through August 22, 2016, and a report was submitted to the court.[1] E.M. was then returned to the JCJDC.

[6]     On September 1, 2016, pursuant to an agreement with the State, E.M. admitted to the allegation in JS-227 and admitted, in part, to the petition to modify probation in JD-362. In exchange, the State dismissed the allegation in JD-233. The juvenile court accepted E.M.'s admissions. The court also approved the agreement of the parties that E.M. be released to his father and be placed on electronic monitoring until the dispositional hearing. At the conclusion of the September 22, 2016 dispositional hearing, the court continued E.M. on supervised probation and also placed him into the juvenile problem-solving court in Lawrence County. At this hearing, the juvenile court informed E.M.'s parents about detention costs, explaining:

> There are detention costs owed as a result of the child spending seventeen (17) days in detention. The rate is one hundred dollars ($100.00) a day to care for the child there. Total owed is one thousand seven hundred dollars ($1,700.00). Those costs are now ordered to be paid to the Lawrence County Clerk's Office and shall be paid before the conclusion of these cases or before the child's released from his probation, unless the Court modifies the orders.

---

[1] It is noted in the report that E.M.'s father was employed at Pizza Hut and Cosner's Ice and that E.M.'s mother was employed at Garden Villa. E.M. reported that his family had enough money to meet their basic health and comfort needs.

*Transcript Supplemental* at 65-66. The court ordered E.M.'s parents to pay for all fees and costs "deemed appropriate by th[e] Court." *Id.* at 68. E.M.'s mother and father were also presented with the written terms and conditions of E.M.'s participation in the problem-solving court, which required that E.M. pay a $240.00 user fee at a rate of $20.00 per month and an administrative fee of $50.00. E.M.'s mother and father were both represented by counsel and did not raise any objections or concerns about the fees and costs associated with the problem-solving court and signed the terms and conditions as presented to them.

[7] Over the next few months, there were short periods when E.M. was compliant with the court's directives, but numerous periods when he engaged in negative behavior at school and at home, including poor academics due to missing school assignments, violating the rules of home detention, engaging in a domestic dispute that resulted in police being called, using his father's debit card without permission, violating curfew, and violating multiple rules of the teen center where he was ultimately placed. As a result of his poor behavior, on January 12, 2017, the State filed a petition for modification of the dispositional decree, and the juvenile court held a hearing the same day. At the time, E.M. was being detained at the JCJDC. Pursuant to an agreement between the parties, the juvenile court ordered E.M. to be placed at the Jackson County Juvenile Group Home for an indefinite period of time, with periodic review hearings. The juvenile court made it clear that E.M. was "still considered a participant" with the problem-solving court. *Id.* at 72.

[8] At the conclusion of the January 12 hearing, the court addressed the matter of "outstanding fees," which at that time totaled $3062.00. *Id*. at 74. The court inquired as to both mother's and father's ability to pay the costs incurred. E.M.'s mother informed the court that she had full-time employment at White River Lodge and picked up extra hours at Garden Villa. The juvenile court asked her how much she was able to pay toward the fee, and she informed the court that she could afford $20.00 a week. The juvenile court then asked E.M.'s father about his ability to pay, and he answered:

> Your Honor, currently, you know, with being in the problem solving court – adult problem solving court – we have done a budget and they have got me currently set up on five ($5.00) a week until my finances come through. I am able to show proof to the Court if I need to. I am, like, five hundred dollars ($500.00) negative monthly. So, it's kind of a bare minimum with that Court, too.

*Id*. at 76. The juvenile court then ordered E.M.'s mother to pay no less than $20.00 per week and E.M.'s father to pay no less than $5.00 per week toward the fees and costs.

[9] Soon after E.M. was placed at the group home, he was assaulted by other teens on two separate occasions. The two offending teens were removed from the facility and staffing changes were made to ensure E.M.'s safety. In light of the changes, the juvenile court continued E.M.'s placement in the group home. On March 9, 2017, the State sought a change of placement due to E.M.'s ongoing behavioral needs and safety issues, and the court ordered that he be detained at

the JCJDC. On March 21, 2017, the court considered alternatives for E.M.'s placement and ultimately ordered that E.M. be placed at the Wernle Youth Treatment Center in Richmond. E.M. successfully completed the program at Wernle and earned his GED. At a review hearing held on August 31, 2017, the juvenile court ordered E.M. released to his father and that he be advanced to phase 2 of the problem-solving court.

[10] E.M. reengaged with the problem-solving court and for the next several months, he was mostly compliant with all requirements. Things took a turn for the worse in early December 2017, when E.M. was involved in an altercation during which a window was broken and E.M. punched his father. Police were summoned, but E.M. left before they arrived, leading to the filing of a delinquency petition for the status offense of runaway. On December 19, 2017, E.M. was again detained at the JCJDC. On December 21, 2017, the State filed a motion for termination of E.M. from the problem-solving court based on a multitude of violations. At a December 26, 2017 detention hearing, the juvenile court ordered that E.M. be released to his father, but that he be placed on electronic home monitoring.

[11] On February 7, 2018, the State filed a request to take E.M. into custody due to non-compliance with home detention and ongoing behavioral problems. At a hearing the following day, E.M.'s father told the court that he was not willing to take E.M. back into his home. The juvenile court thus ordered E.M. to be detained at the JCJDC. At a dispositional hearing on February 12, 2018, E.M. admitted to the allegations against him and agreed to termination of his

participation in the problem-solving court. The juvenile court then placed E.M. in the Department of Correction (the DOC). At the conclusion of the hearing, the court noted that there would be periodic review hearings on "money issues" as the case moved forward and set a review hearing for April 19, 2018.[2] *Transcript Vol. 2* at 69.

[12] E.M. filed a notice of appeal on April 3, 2018. On May 14, 2018, E.M. filed a motion with this court to hold his appeal in abeyance so the case could be remanded for a hearing and order determining costs and fees owed. On May 30, 2018, this court issued an order granting E.M.'s request to hold the appeal in abeyance and remanded to the trial court with directions to enter a final order on costs. Complying with this court's directive, the juvenile court entered a final order on costs on June 8, 2018. The court determined the outstanding amount owed by E.M.'s father and mother for various fees and costs attributable to E.M.'s detention totaled $7997.[3] E.M. now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

---

[2] It is unclear whether the juvenile court held a review hearing as scheduled for April 19, 2018. The chronological case summary has an entry for April 19, 2018 that references "Review Hearing (1:00 PM)" and indicates that an order was issued on February 15, 2018 along with a notation of "*Costs and fees.*" *Appellant's Appendix Vol. Two* at 14. With his notice of appeal, E.M. requested transcripts of certain hearings, but did not list April 19, 2018. The State filed a separate motion requesting transcripts for the omitted hearings and specifically identified April 19, 2018. The juvenile court prepared and submitted a supplemental transcript, but such does not include a transcript dated April 19, 2018.

[3] E.M.'s father and mother had already paid a combined amount of $1328.

On appeal, E.M. argues that the juvenile court erred in ordering his parents to reimburse costs and fees totaling $7997 without a hearing and without consideration of statutory factors. The State argues that the court was not required by statute to make specific findings and that the court did not abuse its discretion in ordering E.M.'s parents to pay a reasonable weekly amount toward his detention costs. The State also asserts claims of waiver, invited error, and mootness.

A delinquent child's parents are financially responsible for any services ordered by the court and must reimburse the county unless the court determines that they are unable to pay for them, payment would be an unreasonable hardship on the family, or justice would not be served. *Matter of Garrett*, 631 N.E.2d 11, 13 (Ind. Ct. App. 1994), *trans. denied*. The right to reimbursement, however, is not unlimited, and the trial court must comply with the statute. *In re M.L.K.*, 751 N.E.2d 293, 298 (Ind. Ct. App. 2001) (citing *Washburn v. Tippecanoe Cty. Office of Family & Children*, 726 N.E.2d 361, 364 n. 3 (Ind. Ct. App. 2000)).

The reimbursement statute, Ind. Code § 31-40-1-3, provides, in pertinent part:

> (a) A parent or guardian of the estate of:
>
> > (1) a child adjudicated a delinquent child . . . is financially responsible . . . for any services provided by or through the department.
>
> * * *

> [T]he juvenile court shall order the child's parents or the guardian of the child's estate to pay for, or reimburse the department for the cost of services provided to the child or the parent or guardian unless the court makes a specific finding that the parent or guardian is unable to pay or that justice would not be served by ordering payment from the parent or guardian.

We have held that the juvenile and/or the juvenile's parents bear the burden of presenting evidence to support the findings that would relieve them of the obligation to reimburse. *See J.W. Hendricks Cty. Office of Family & Children*, 697 N.E.2d 480, 483 (Ind. Ct. App. 1998) (affirming an order of reimbursement where "the juvenile court found that the [parents] 'failed to carry their burden of proof to show that they are unable to pay or that justice would not be served by ordering payment from the parents'").

[16] Over twenty years ago, this court examined the reimbursement statute in *In re the Matter of C.K.*, 695 N.E.2d 601 (Ind. Ct. App. 1998), *trans. denied*. In that case, C.K.'s father appealed the trial court's order that he reimburse the county for $52,276, the costs of C.K.'s out-of-home placement in various facilities after being adjudged delinquent. After reviewing the statute and concluding that "the OFC clearly has the right to seek reimbursement by the child's parents for the costs of any services provided to the delinquent child," we noted that the OFC's right to do so is not unlimited, and the trial court must comply with the statute's requirements. *Id*. at 605. Because there was no evidence in the record that the trial court inquired into C.K.'s parents' ability to pay $52,276 or whether such an order would serve the interests of justice, we reversed the trial

court's order and remanded the matter for reconsideration. In doing so, we noted that "[s]ound public policy dictates that the court consider the factors laid out in [the statute] and state its findings thereon before placing such a large financial burden on a delinquent child's parents." *Id*.; *see also M.Q.M. v. State*, 840 N.E.2d 441 (Ind. Ct. App. 2006) (accepting the argument that juvenile court improperly ordered delinquent child's parents to pay fees without inquiring into their ability to pay); *M.L.K.*, 751 N.E.2d at 298 (adopting the *C.K.* approach of requiring the juvenile court to consider the statutory factors and state its findings before ordering parents to reimburse over $20,000); *Wayne v. Wells Cty. Dep't of Family & Children*, 751 N.E.2d 293 (Ind. Ct. App. 2001) (holding that the legislature intended to include the ability to pay inquiry into the statute and therefore, juvenile court must inquire into ability to pay before ordering payment of costs and fees for juvenile's detention).

[17] More recently, in *J.T. v. State*, 111 N.E.3d 1019 (Ind. Ct. App. 2018), *trans. denied*,[4] this court addressed whether the juvenile court abused its discretion in ordering the juvenile's mother to reimburse detention costs totaling $7463 without making express findings as to the statutory factors. After J.T.'s participation in the problem-solving court was terminated a second time, he was committed to the DOC. Because J.T.'s father was incarcerated, the juvenile court held a review hearing on fees for J.T.'s mother and informed her

---

[4] Our Supreme Court denied transfer in *J.T.* by a vote of 3-2. Justice David dissented from the denial of transfer with a separate opinion in which Justice Goff joined.

of the total costs for J.T.'s detention. J.T.'s mother specifically stated that she could pay $20 a month, and the juvenile court ordered her to pay such amount toward the amount owed.

[18] On appeal, J.T. relied on *C.K.* and *M.L.K.* in support of his argument that the juvenile court abused its discretion in ordering his mother to pay costs and fees attributable to his detention because the court did not make any findings regarding the statutory factors. The majority in *J.T.* distinguished *C.K.* and *M.L.K.*, in part, on grounds that those cases involved financial burdens that were much larger than that at issue in J.T.'s case. The *J.T.* majority also stated that if J.T.'s parents "considered the balance or the monthly payments to be a 'large financial burden,' they were free to say so, but did not." *Id*. at 1025. The majority "decline[d] to declare an amount beyond which explicit findings must be made in cases such as this," but concluded that "the balance in this case falls below that threshold." *Id*. In short, the majority concluded that the juvenile court did not abuse its discretion.

[19] As expected, E.M. directs us to *C.K.* and its progeny, while the State asserts that *J.T.* supports a finding that the juvenile court did not abuse its discretion. We are persuaded by the former cases.

[20] As the State points out, the juvenile court did inquire at one time of E.M.'s parents as to their individual ability to pay costs. The record reveals that E.M.'s parents are both employed but does not indicate their earning capacities. On the surface, it would appear that their jobs are not of high-income potential.

Indeed, when the court inquired, E.M.'s mother stated that she had the ability to afford $20 a week, while E.M.'s father explained that he was then operating on a negative budget and suggested that he could pay $5 a week toward the costs attributable to services for his son.[5] It is significant, however, that the hearing at which such matters were addressed was in January 2015, nearly eighteen months before the court issued the final order on costs. In that time, E.M. was in and out of detention centers and the total fees and costs attributable to his detention more than doubled.

[21] The juvenile court noted at the hearing when E.M.'s participation with the problem-solving court was terminated the need for further review hearings to address "money issues." *Transcript Vol. 2* at 69. From the record before us, there appears to have been no further review hearings.[6] Rather, the court simply issued a final order that E.M.'s parents were to reimburse approximately $8000 in costs. While this amount is not as sizable as the total costs accumulated in some of the referenced cases, we do not find this to be dispositive.

[22] The reimbursement statute provides that the juvenile court "shall" order parents to pay for or reimburse the costs of services provided to the delinquent child

---

[5] We reject the State's arguments that in agreeing to pay a nominal amount toward costs nearly eighteen months before the final order on costs amounts to waiver of the issue on appeal or constitutes invited error.

[6] We reject the State's argument that because the court indicated that there would be review hearings as to the matter of reimbursement for costs attributable to E.M.'s detention that the issue presented is moot. There appears to have been no further review hearings and the trial court has now issued a final order on costs. With the filing of the notice of appeal, the juvenile court lost jurisdiction to further consider such matters.

"unless" the court finds that parents are unable to pay or that justice would not be served. I.C. § 31-40-1-3(c). Thus, implicit in an order for parents to reimburse costs is that parents are able to pay and that such is in the interest of justice. Hence, this court has held that the reimbursement statute requires the juvenile court to inquire into parents' ability to pay and what justice requires for any given set of circumstances before it can order parents to pay or reimburse costs. *See C.K.*, 695 N.E.2d at 605 ("[s]ound public policy dictates that the court consider the factors laid out in [the reimbursement statute] and state its findings thereon before placing such a large financial burden on a delinquent child's parents"); *M.L.K.*, 751 N.E.2d at 298-99 ("the approach adopted in *C.K.* is more consistent with the legislative purpose in including the ability to pay inquiry in the statute").

[23] Here, in light of the tenuous financial position of E.M.'s parents as well as the extended period of E.M.'s detention, we think it was incumbent on the juvenile court to have inquired again into whether E.M.'s parents were unable to pay or whether the interests of justice would be served by ordering them to reimburse additional costs of nearly $8000. The brief inquiry more than eighteen months prior and when costs were nearly half of the final total did not provide a sufficient basis on which to consider the statutory requirements to support the juvenile court's final order on costs.

[24] As Judge Bailey notes in his dissent in *J.T.*, the juvenile court is not constrained to order parents to pay "all or nothing." 111 N.E.3d at 1028. The juvenile

court is in the best position to consider the ability of E.M.'s parents to pay costs and determine an amount that that is commensurate with justice.

[25] Judgment reversed and remanded for further proceedings.

Najam, J. and Pyle, J., concur.