## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 12 2019, 6:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michelle Laux
St. Joseph County Public Defender's Office
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tiffany A. McCoy
Angela Sanchez
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.R.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

June 12, 2019

Court of Appeals Case No.
18A-JV-2206

Appeal from the
St. Joseph Probate Court

The Honorable
James N. Fox, Judge

Trial Court Cause No.
71J01-1607-JD-210

**Kirsch, Judge.**

[1] Following his admission to sexual battery,[1] which would be a Level 6 felony if committed by an adult, J.R. appeals his placement with the Indiana Department of Correction ("the DOC") and raises the following issue for our review: whether the juvenile court abused its discretion when it ordered his placement in the DOC. He asserts that the placement was not close to his family and home, was punitive instead of rehabilitative, and was not the least restrictive placement or most appropriate setting for him.

[2] We affirm.

## Facts and Procedural History

[3] On July 7, 2016, J.R., who was fifteen years old at the time, entered the home of his adult neighbor, C.P., unannounced and uninvited. *Appellant's App. Vol. II* at 103. At that time, C.P.'s two young children were playing outside, and she was on the computer in her bedroom. *Id.* J.R. entered C.P.'s bedroom with his erect penis sticking out of his pants. *Id.* J.R. approached C.P. and placed his bare penis on her arm and rubbed her arm. *Id.* at 114. C.P. immediately told J.R. to leave and that his behavior was very inappropriate. *Id.* at 103. J.R. ignored C.P.'s command, grabbed her by both upper arms and attempted to force her down on the bed. *Id.* C.P. pushed back and was able to keep herself on her feet, but J.R. continued to hold her shoulders. *Id.* C.P. repeatedly yelled for J.R. to leave, but instead, he ran his hands down C.P.'s sides to her buttocks

---

[1] *See* Ind. Code § 35-42-4-8(a)(1)(A).

and squeezed with both hands. *Id.* While still holding onto C.P.'s arms, J.R. also attempted to kiss her on the neck several times. *Id.* Despite C.P. continuously telling J.R. to get out of her bedroom and house, J.R. continued to restrain C.P., grope her, and attempt to kiss her. *Id.* Before releasing C.P. and leaving the house, J.R. told C.P., "I'm going to eat your pussy tomorrow." *Id.* J.R. then let C.P. go, said "I'm sorry," and walked out the front door. *Id.* C.P. told her live-in boyfriend what had happened, and he called the police. *Id.* at 106. C.P. told the responding officer that she knew J.R., that he lived three or four doors north, and that he had played with her children before. *Id.*

[4] J.R. was arrested the same day. A detention hearing was held on July 11, 2016, and J.R. was detained at the St. Joseph County Juvenile Justice Center. *Id.* at 16. On July 18, 2016, the State filed a delinquency petition against J.R., charging him with criminal confinement and sexual battery, both of which would have been a Level 6 felony if committed by an adult. *Id.* at 21. On July 29, 2016, the State filed an admission agreement that offered to dismiss the criminal confinement charge if J.R. admitted to the sexual battery charge. *Id.* at 23. At the initial hearing, held that same day, J.R. admitted to sexual battery pursuant to the admission agreement. *Id.* at 48-52.

[5] At the dispositional hearing, held on October 14, 2016, the State expressed concern about the seriousness of J.R.'s offense and recommended placement with more supervision. *Id.* at 56-57. The juvenile court reasoned that it was in J.R.'s best interest to be in the community and engage in intensive out-patient counseling and placed J.R. on strict and indefinite probation. *Id.* at 29, 61. The

juvenile court also gave J.R. multiple court ordered requirements, including writing an apology letter to the victim, attending school regularly without any unexcused absences, tardies, or suspensions, participating in a prosocial activity, and obtaining a part-time job or completing twenty hours of community service. *Id.* at 30.

[6] On March 1, 2017, almost five months after the dispositional hearing, a petition for modification was filed, and a modification hearing was held April 7, 2017. *Id.* at 9, 32-34. At that time, J.R. had not written his apology letter to the victim, completed any community service, or found a part-time job; he also had multiple issues in school resulting in three out-of-school suspensions and his expulsion from school. *Id.* at 64, 134. Specifically, J.R. received a two-day suspension for his involvement in a fight concerning a stolen cell phone on February 2, 2017. *Id.* at 134. J.R. was filming the altercation and could be heard provoking the students to fight. *Id.* Three days after J.R. returned to school from that suspension, he received another three-day suspension on February 21, 2017, for threatening to shoot a student. *Id.* When J.R. returned to school on February 27, 2017, he was suspended for five days with expulsion requested because he had twice engaged in sexual activity with a female student on school property in the choir dressing room. *Id.*

[7] The probation department was concerned that J.R. continued to place himself in high risk situations and was being uncooperative and violating his probation. *Id.* at 144. The juvenile court determined that J.R. was in need of supervision, care, treatment, and services that were not available in the community and that

it was in his best interest to remove him from the home. *Id*. at 32-33. The court ordered J.R. to be placed in Oaklawn, a residential program, to complete sex offense programming. *Id*. at 33.

[8] Because the probation department was concerned with J.R.'s impulsivity and risky decision making, an examination of J.R.'s sexual history was conducted through a polygraph test. *Id*. at 146-51. During this examination, J.R. admitted that he became sexually active at the age of fourteen, and that, over the next two years, he had a sexual relationship with at least twenty different teen-aged females, with many instances occurring on school grounds. *Id*. at 147-48. J.R. also admitted that when he was thirteen, he had his four-year-old cousin touch his penis and, when he was fourteen, he and his sister engaged in mutual fondling. *Id*. at 150.

[9] In his first month at Oaklawn, J.R. struggled with his behavior and attitude, but, in his second month, he became more engaged in treatment. *Id*. at 74. After completing Oaklawn's program, in April 2018, he was placed back into the care of his mother and was ordered to continue probation and participate with aftercare services through Lincoln Therapeutic Partnership ("LTP"). *Id*. at 79, 163-64. After he was placed back in his mother's care, probation stated J.R. became "arrogant" and did not "take his probation seriously." *Id*. at 172. He missed several appointments, and the probation department learned that when he was released from Oaklawn, J.R. almost immediately began violating his safety plan. *Id*. Specifically, another juvenile on probation who was only

thirteen at the time indicated that, beginning in April 2018, she and J.R. engaged in a sexual relationship. *Id*.

[10] J.R. took another polygraph examination on July 26, 2018, and after receiving his results, LTP discharged him from therapy because he violated treatment guidelines. *Id*. at 84. J.R. admitted to regular pornography use, sexual activity with five to six teen-aged females, going to parties, sending and receiving nude images, videoing girls during sexual acts, using marijuana, and using social media. *Id*. at 84, 173-74. On August 14, 2018, J.R. was detained because he was not in compliance with probation. *Id*. at 41. On August 21, 2018, a modification hearing was held, and the probation department recommended that J.R. be placed in the DOC because, although J.R. had completed a year of residential placement and had been ordered to participate in aftercare services, he was uncooperative, violated his safety plan multiple times, and had an overall assessment score that placed him in the high-risk category to reoffend. *Id*. at 177-78.

[11] The juvenile court determined that J.R.'s continued placement at home would not provide the level of structure and supervision necessary and that it was in J.R.'s best interest to be removed from the home. *Id*. at 42–43, 178. The juvenile court ordered J.R. to the DOC, which would be suspended if LTP was willing to accept J.R. back into its treatment program. *Id*. at 43. LTP was unwilling to do so because J.R. consistently violated his treatment plan. *Id*. at 180. The probation department recommended placement in the DOC because LTP was the sole provider of sex offender specific treatment in St. Joseph

County, and no other community program was offered that would meet J.R.'s treatment needs. *Id.* The juvenile court ordered J.R. to be placed in the DOC. *Id.* at 44-46. When committing J.R. to the DOC, the juvenile court found that "reasonable efforts were made to prevent or eliminate the need for removal" and that the modification was the least restrictive alternative to insure the child's welfare and rehabilitation and the safety and welfare of the community." *Id.* at 44-45. J.R. now appeals.

## Discussion and Decision

[12] J.R. argues that the juvenile court abused its discretion when it ordered him to be placed in the DOC because such a placement was punitive instead of rehabilitative, especially because J.R. had no prior encounters with the juvenile justice system. J.R. contends that his placement in the DOC was also not the least restrictive and most family-like setting available and was contrary to Indiana Code section 31-37-18-6. He maintains that, after he completed his initial treatment at LTP, he should have been released from probation, but because he was not, he was punished for participating in consensual sex with other teenagers, which was not criminal behavior.

[13] "A juvenile court is accorded 'wide latitude' and 'great flexibility' in its dealings with juveniles." *J.T. v. State*, 111 N.E.3d 1019, 1026 (Ind. Ct. App. 2018) (citing *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008)), *trans. denied*. The choice of a specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court and will only be

reversed if there has been an abuse of that discretion. *Id.* "The juvenile court's discretion in determining a disposition is subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least-harsh disposition." *Id.* An abuse of discretion occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

[14] The goal of the juvenile process is rehabilitation, not punishment. *Id.* "'Accordingly, juvenile courts have a variety of placement choices for juveniles who have delinquency problems, none of which are considered sentences.'" *Id.* (quoting *R.H. v. State*, 937 N.E.2d 386, 388 (Ind. Ct. App. 2010)). Indiana Code section 31-37-18-6 provides that:

> If consistent with the safety of the community and the best
> interest of the child, the juvenile court shall enter a dispositional
> decree that:
>
> (1) is:
>
> (A) in the least restrictive (most family like) and most appropriate
> setting available; and
>
> (B) close to the parents' home, consistent with the best interest
> and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;

(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian;

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

Ind. Code § 31-37-18-6. "[T]he statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement." *J.S.*, 881 N.E.2d at 29 (citing *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied*). The law requires only that the disposition selected be the least restrictive disposition that is "consistent with the safety of the community and the best interest of the child." *J.T.*, 111 N.E.3d at 1026 (citing *D.S. v. State*, 829 N.E.2d 1081, 1085 (Ind. Ct. App. 2005)).

[15] At the time of the disposition, J.R. was seventeen years old, and his case had been ongoing since he was fifteen years old. Although he did not have any prior juvenile adjudications, this case involved a sexual battery, where he entered his neighbor's house unannounced, exposed his penis, and forcibly restrained the neighbor while squeezing her buttocks and attempting to kiss her. The State recommended placement with more supervision because of the severity of the offense, but the juvenile court, reasoning that it was in J.R.'s best interest to be in the community and to engage in intensive out-patient counseling, placed J.R. on strict and indefinite probation. *Appellant's App. Vol. II* at 29, 56-57, 61. The juvenile court also ordered J.R. to write the victim an apology letter, attend school regularly without any unexcused absences, tardies,

or suspensions, participate in a prosocial activity, and obtain a part-time job or complete twenty hours of community service. *Id*. at 30.

[16] Nine months later, J.R. had violated multiple terms of his probation. He failed to write the apology letter, to complete community service, and to find a part-time job. He had multiple issues in school resulting in three out-of-school suspensions and a request for expulsion. *Id*. at 64, 134. He had been suspended for provoking students to fight, threatening to shoot another student, and engaging in sexual activity while on school property. *Id*. at 64, 134. At that time, the juvenile court ordered J.R. to Oaklawn for a residential treatment program, finding that it was in his best interest to be removed from the home because "[c]ontinued placement at home would not provide the level of structure and supervision necessary to prevent future delinquent behaviors which are harmful to [J.R.] and others." *Id*. at 35.

[17] After some initial struggle with his behavior, J.R. was able to complete the program at Oaklawn and was released back to his mother's care and ordered to continue on probation. *Id*. at 79-80. J.R. asserts that, at that time, he should have been released from probation because the case had been ongoing for almost two years. However, the juvenile court determined that it was in his best interest to monitor him after he finished the treatment program at Oaklawn to determine if J.R. could apply the progress he made while in treatment to his life at home. The juvenile court stated, "you're going to have a lot more freedom…with that freedom comes responsibility… if you comply with all the terms we have, they're talking about closing the case, but that's going to require

you to make good decisions." *Id*. at 79-80. This was a reasonable course of action by the juvenile court and clearly aimed at ensuring that the goal of rehabilitation had been reached.

[18] Instead of applying what he had learned at Oaklawn, J.R. violated probation and his safety plan multiple times and was ultimately discharged from LTP for violating treatment guidelines. *Id*. at 84. Within about three months from his release from Oaklawn, J.R. admitted to using social media, going to parties, using marijuana, regular pornography use, sexual activity with five to six same-aged females, sending and receiving nude images, and videotaping females during sexual acts, all of which violated probation and his safety plan. *Id*. at 84, 173-74. Additionally, another juvenile on probation indicated that she and J.R. were in a sexual relationship that had begun in April 2018. *Id*. at 172. This indicated that upon release from Oaklawn J.R. immediately began violating his safety plan, and that despite his treatment focusing on the age of consent, he was sexually involved with a thirteen-year-old female when he was seventeen years old. *Id*. at 172. When committing J.R. to the DOC, the juvenile court found that "reasonable efforts were made to prevent or eliminate the need for removal" and that the modification was the least restrictive alternative to insure the child's welfare and rehabilitation and the safety and welfare of the community." *Id*. at 44-45.

[19] J.R. maintains that the juvenile court's determination that he be placed in the DOC was punitive rather than rehabilitative, citing to *E.H. v. State*, 764 N.E.2d 681 (Ind. Ct. App. 2002), *trans. denied*. In that case, E.H. was adjudicated a

delinquent for the theft of a necklace, and this court vacated the juvenile court's dispositional order placing E.H. in the DOC because "the one-year commitment imposed by the juvenile court conflicts with rehabilitative goals of the juvenile justice system." *Id*. at 685-86. This court noted that E.H. had recently been placed in a stable foster home where he was making significant improvement with his adjustment issues and was enrolled in home-based counseling and in a program assisting with reunification with his family and was making significant progress in both programs. *Id*. at 686. This court also stated that there was "no evidence . . . that E.H. is a threat to the community." *Id*. This court concluded that in light of E.H.'s recent progress and given the nature of his offense, a less restrictive placement would be more appropriate for E.H. *Id*.

[20] J.R. contends that, like in *E.H.*, his placement in the DOC should be found to conflict with the rehabilitative goals of the juvenile system, especially in light of the fact that J.R. has no prior encounters with the juvenile justice system. However, *E.H.* is distinguishable from this case. First, J.R.'s offense, the sexual battery of a neighbor, was far more serious than E.H.'s offense, which was the theft of a necklace. Second, and more significant, unlike E.H., who was showing signs of improvement and was not deemed to be a threat to the community, here, J.R. had not shown improvement and was deemed to be a threat to the community and himself because of his lack of improvement and behavior.

[21] J.R. asserts that the juvenile court failed to consider an alternative placement when it placed him in the DOC. Just because a less restrictive alternative exists, however, does not mean that the juvenile court must follow it. *D.C. v. State*, 935 N.E.2d 290, 292 (Ind. Ct. App. 2010) ("[T]he availability of a less restrictive alternative does not mean the juvenile court was required to order that placement."), *aff'd on trans.*, 958 N.E.2d 757 (Ind. 2011). Indiana Code section 31-37-18-6 provides that the trial court is only required to consider the least restrictive placement *if* that placement comports with the safety needs of the community and the child's best interests. *See J.B. v. State*, 849 N.E.2d 714, 717-18 (Ind. Ct. App. 2006) (concluding that the trial court did not abuse its discretion when it committed the juvenile to the DOC because the less-restrictive placement suggested by him would have fallen short of meeting the community's safety needs), *trans. denied*.

[22] In mentioning the seriousness of J.R.'s underlying offense, his continuous risky behavior, uncooperativeness with probation, and violation of his safety plan, the juvenile court considered his danger to the safety of the community. We have previously found that the seriousness of an offense and the likelihood of re-offense allow for commitment to the DOC. *See, e.g.*, *D.C.*, 935 N.E.2d at 293 ("Given the serious nature of D.C.'s offense and the likelihood that he will reoffend, this is clearly a situation in which commitment to a less restrictive environment than DOC is not in the best interest of D.C. or of the community."). Additionally, the juvenile court's finding that J.R. had completed a year of residential treatment, which had failed to curb his risky

behavior, showed that such services were no longer in J.R.'s best interest. Although J.R. asserts that he did nothing criminal and was being punished for typical teenager behavior, the evidence showed that, while on probation, J.R. did commit potentially illegal acts, and the juvenile court properly considered these acts when determining the best placement.

[23] We conclude that it was reasonable for the juvenile court to find that the services and opportunities offered to J.R. had not been successful and that he posed a danger to both himself and to the community. Because of the serious nature of J.R.'s underlying offense, his failure to engage in and benefit from past services offered, and the likelihood that he will reoffend, we find that the juvenile court was within its discretion to conclude that commitment to a less restrictive environment than the DOC was not in the best interest of J.R. or consistent with the safety of the community. The juvenile court did not abuse its discretion when it ordered J.R.'s placement in the DOC.

[24] Affirmed.

Vaidik, C.J., and Altice, J., concur.